**MOVEMENT FOR OPPORTUNITY AND EQUALITY et al., Plaintiffs-Appellants,**

**v.**

**GENERAL MOTORS CORP. et al., Defendants-Appellees.**

No. 78–2314.

United States Court of Appeals, Seventh Circuit.

Argued May 25, 1979.

Decided April 23, 1980.

Rehearing Denied June 10, 1980.

William D. Wells, NAACP, New York City, John O. Moss, Indianapolis, Ind., for plaintiffs-appellants.

Herbert C. Snyder, Jr., Indianapolis, Ind., Edwin G. Fabre, Asst. Gen. Counsel, Int'l Union, UAW, Detroit, Mich., for defendants-appellees.

Before FAIRCHILD, Chief Judge, SWYGERT, Circuit Judge, and KUNZIG,* Judge.

* Judge Robert L. Kunzig of the United States Court of Claims is sitting by designation.

KUNZIG, Judge.

This case involves two major issues, jurisdictional and proof of discrimination, which surround allegations of racial and sexual discrimination at General Motors' Allison Division plant in Indianapolis, Indiana. In addition to the preliminary jurisdictional issue, there is a second threshold problem concerning the appropriate statute of limitations. In a lengthy and thorough decision, Judge Noland of the Federal District Court for the Southern District of Indiana found that General Motors had not discriminated against either the individual plaintiffs or the classes they represent. Consequently, he denied declaratory, monetary, and injunctive relief under both Title VII of the Civil Rights Act of 1964, 78 Stat. 253, 42 U.S.C. §§ 2000e–2000e–17 (1976) and the Civil Rights Act of 1866, 42 U.S.C. § 1981 (1976).

One threshold issue is jurisdictional. The problem involves the necessity of receiving a right to sue letter from the Equal Employment Opportunity Commission (EEOC) in order to maintain an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1976). We follow the Supreme Court's decision in Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) and hold that receipt of a right to sue letter is a prerequisite to the maintenance of suit under Title VII. A second threshold problem requires us to determine the appropriate statute of limitations under Indiana law for the Civil Rights Act of 1866, 42 U.S.C. § 1981 (1976). Here, we follow our decision in Hill v. Trustees of Indiana University, 537 F.2d 248 (7th Cir. 1976), and agree with Judge Noland that a two-year statute of limitations is appropriate.

The second major issue for discussion involves the manner of proving discrimination through the use of statistics under Title VII and section 1981 for the class actions. We consider that the district judge properly relied on defendants' statistics showing the flow of people by race and sex into and within the work force rather than plain-

tiffs' statistics concentrating on specific instances in time when an artificial discrepancy occurred.

To the extent not inconsistent with the following, the court adopts Judge Noland's Memorandum of Opinion and attaches it (with the exception of certain portions not challenged on appeal discussing the claims of individual class members) as an appendix hereto. We feel it necessary, however, to analyze and clarify in an abbreviated manner our position on the above two major issues.

## HISTORY OF THE CASE

General Motors Allison plant engineers, manufactures and assembles aircraft, diesel and locomotive engines. The total work force has fluctuated between 13,000 and 15,600 employees. The workers are divided into salaried and hourly employees. Ninety-six percent of the hourly workers are skilled or semi-skilled. Of the salaried work force, some seventy-five percent are professionals and some fifteen percent are clerical or office help. Numerous employees are represented in collective bargaining by Local 933, United Automobile Aerospace and Agricultural Implement Workers of America.

In 1973, nine minority and women employees filed suit against General Motors (GM) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 (1976) and the Civil Rights Act of 1866, 42 U.S.C. § 1981 alleging racial and sexual discrimination in GM's employment practices.[1] Specifically, plaintiffs charged GM with employment discrimination in the areas of hiring, job assignment, rates of pay, entry into skilled trades, transfer and promotion in union-covered jobs, and promotion to supervisory and managerial positions. As to the union defendants,[2] plaintiffs charged them with violating Title VII and section 1981 both for permitting GM to engage in discrimination and engaging in collective bargaining which denied plaintiffs equal opportunity. Plaintiffs sought declaratory, monetary and injunctive relief.

Judge Noland held that neither GM nor the unions discriminated against either the named plaintiffs or the classes they represented. As stated above, we agree with the district court. Furthermore, we note that plaintiffs only dispute the legal standards applied and not the specific findings of fact.

Initially, the lower court had to determine the relevant time frame within which to analyze plaintiffs' claims. The court determined that a right to sue letter was required under Title VII and that a two-year statute of limitations applied as to section 1981 claims. Under discussion in our first section will be the legal standards applicable to these jurisdictional issues.

Judge Noland then had to determine which classes to certify under Federal Rule of Civil Procedure 23(a). He properly certified five classes. (See appendix, Part II, *infra.*)

The district judge also determined correctly the standards of liability for defendants' alleged misconduct.[3] (See appendix, Part III, *infra.*)

Remaining problems concern proof of discrimination. Our difficulties here deal with plaintiffs' *class claims* which largely involved statistical proofs by both parties.[4] As to the appropriate use of statistics, we feel defendants' figures showing a flow

1. Plaintiffs' claims alleging discrimination on the basis of sex are only covered under Title VII, *see, e. g., United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) and not by § 1981. *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).

2. The union defendants were Local 933, United Automobile Aerospace and Agricultural Implement Workers of America, and International United Automobile, Aerospace and Agricultural Implement Workers of America—U.A.W.

3. Applying those standards of liability to the union defendants, the lower court properly dismissed the suit against them at the conclusion of plaintiffs' case.

4. As to the individual claims, the trial court weighed testimony and other evidence and determined that no discrimination was perpetrated.

over time are more appropriate. This will be discussed more fully in our section II.

## I. THRESHOLD PROBLEMS

The two threshold problems are of paramount importance because—by determining whether a right to sue letter is needed under Title VII and the relevant statute of limitations for section 1981, we are thereby outlining the parameters within which to consider evidence of discrimination.

### A. Title VII—Right to Sue Letter

In the majority of Title VII claims before the district court, individual plaintiffs filed charges with the EEOC between 1970 and 1973. Thereafter, the EEOC issued right to sue letters based on those charges and plaintiffs brought suit in 1973. As to these claims, there are no jurisdictional problems.

■ The time period in question under Title VII in this court relates solely to the charges of discrimination in promotion and transfer of hourly workers. The individual employee and class representative for these claims is Beulah Wallace. She filed a charge with the EEOC on August 13, 1970 alleging racial and sexual discrimination in promoting and transferring hourly employees. Under that charge and subsequent right to sue letter, the appropriate time frame begins October 17, 1969.[5] That period for the individual representative of the class also controls the time period for the class. *Romasanta v. United Air Lines, Inc.,* 537 F.2d 915 (7th Cir. 1975), *aff'd sub nom. United Air Lines v. McDonald,* 432 U.S. 385, 97 S.Ct. 2464, 52 L.Ed.2d 423 (1977); *Bowe v. Colgate Palmolive Co.,* 416 F.2d 711, 720 (7th Cir. 1969).

Ms. Wallace, however, had also written the EEOC in 1966 to charge defendants with discrimination as to hourly workers in 1966. Plaintiffs argue that this earlier notification should be used to determine the time period for review. Obviously, if plaintiffs' argument were adopted, the time frame would extend back from 1969 to sometime in 1965–66. As with Judge Noland, we cannot agree with plaintiffs.

■ Congress has provided explicit jurisdictional requirements for Title VII in 42 U.S.C. § 2000e–5 (1976). As the Supreme Court has noted, plaintiffs here had to meet a two-part requirement in order to maintain suit against GM. First, plaintiffs must have filed a charge with EEOC. Second, they must have received a right to sue letter from the EEOC and acted upon it. *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973); *Choate v. Caterpillar Tractor Co.,* 402 F.2d 357 (7th Cir. 1968).

As stated, there is no question as to the 1970 charge and subsequent right to sue letter conferring jurisdiction as of October 17, 1969. The difficulty with her 1966 charge is that Ms. Wallace only satisfied half the requirements. Plaintiff Wallace's 1966 charge can be considered to constitute a proper complaint filed with the EEOC. *See Love v. Pulman,* 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). However, she never sought nor received a right to sue letter from EEOC in relation to these charges.

■ Plaintiff Wallace's failure to pursue the 1966 charges further with EEOC is similar to the neglect we held jurisdictionally fatal in *Gibson v. Kroger Co.,* 506 F.2d 647 (7th Cir. 1974). In *Gibson,* we agreed with the D.C. Circuit's decision in *Stebbins v. Continental Insurance Companies,* 442 F.2d

---

5. Ms. Wallace filed her charges on August 13, 1970. Since this action was pending before the EEOC after the effective date of the 1972 amendments, Pub.L. 92–261 § 4, 86 Stat. 104, March 24, 1972, the 300-day limitation applies rather than the original 210-day limit in effect when the complainant filed charges. *International Union of Elec. Radio and Mach. Workers, AFL–CIO, Local 790 v. Robbins & Meyers,* Inc., 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1970). Since claimant filed properly with the EEOC, the appropriate time frame begins on Oct. 13, 1969, 300 days prior to filing. By contrast, if the two-year statute of limitations defined the applicable time period, then the correct period would commence two years prior to filing the complaint—Aug. 23, 1971.

843 (D.C. Cir. 1971), that Title VII claimants are under a duty to seek their right to sue letter if they wish to pursue their claim in the courts. 506 F.2d at 652. While we recognize that in special circumstances the claimant may be unable to seek the right to sue letter, and hence the strict requirements may be loosened, those circumstances would seem limited to instances where the claimant's failure is due to misleading acts committed by the EEOC, employer or union. *See, Gibson, id.* at 652; *Choate v. Caterpillar Tractor Co.*, 402 F.2d 357, 361 (7th Cir. 1968) (complainant should not be held liable for EEOC delay); *Cf., Leake v. University of Cincinnati*, 605 F.2d 255 (6th Cir. 1979) (employer's misleading); *Dartt v. Shell Oil Co.*, 539 F.2d 1256 (10th Cir. 1976), *aff'd by an equally divided court*, 434 U.S. 99, 98 S.Ct. 600, 54 L.Ed.2d 270 (1977).

■ In this situation, moreover, the EEOC had no duty to Ms. Wallace on receipt of her 1966 letter other than to inform her that it could not move ahead until the state agency completed its proceedings or after 60 days had elapsed. The EEOC did in fact inform plaintiff of the need to take further action in order to treat the letter as a charge. Yet Ms. Wallace took no further action until 1970. Moreover, when she subsequently sought a right to sue letter concerning the 1970 charges, neither she nor her attorney sought it as to the 1966 charges. Thus, in light of the clear statutory language and controlling precedent, we are compelled to conclude that plaintiff's failure to request and obtain a right to sue letter as to the 1966 charges deprives the court of any jurisdiction over those earlier years. As the Supreme Court stated in *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), "A discriminatory act which is not the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed." *Id.* at 558, 97 S.Ct. at 1889.

In summary, we concur with the district judge that the failure to procure a right to sue letter as to the 1966 charges was fatal. Thus, the 1970 charges where plaintiff Beu-

lah Wallace followed the appropriate procedures are controlling, and the jurisdictional date governing her individual and class representative aspect of this case is October 17, 1969.

**B. § 1981—State Statute of Limitations**

■ The other threshold issue also deals with the appropriate time frame within which the district court could consider plaintiffs' charges of discrimination. Plaintiffs sued defendants alternatively under 42 U.S.C. § 1981 (1976) for all race-related charges of discrimination. Since section 1981 contains no specific statute of limitations, we must look to the "most appropriate one provided by state law." *Johnson v. Railway Express Agency*, 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975). We conclude, as did the district court, that a two-year statute of limitations applies.

■ In applying the Supreme Court's *Johnson* rule, we have stated, "[T]he applicable limitations period is that which a court of the State where the federal court sits would apply had the action been brought there." *Beard v. Robinson*, 563 F.2d 331, 334 (7th Cir. 1977). We must be mindful, however, that "considerations of state law may be displaced where their application would be inconsistent with the federal policy underlying the cause of action under consideration." *Johnson v. Railway Express Agency, supra* 421 U.S. at 465, 95 S.Ct. at 1722; *Beard v. Robinson, supra* at 334.

We are faced in this case with choices ranging between two and 15 years. The selection largely boils down to choosing between the two-year tort statute of limitations, Ind.Code Ann. § 34–1–2–2 (1973), and a 15-year residuary statute. *Id.* at § 34–1–2–3. When faced with such a choice under *Illinois* law, we felt the five-year general statute of limitations was more appropriate than a two-year tort limit. *Beard v. Robinson*, 563 F.2d 331, 334–38 (7th Cir. 1977); *Teague v. Caterpillar Tractor Company*, 566 F.2d 7 (7th Cir. 1977). Nonetheless, it is *Indiana* rather than Illinois law which must apply here. *See Johnson v. Railway Ex-*

*press Agency, supra.* Moreover, in *Hill v. Trustees of Indiana University,* 537 F.2d 248 (7th Cir. 1976), we have already chosen the two-year statute of limitations for analogous section 1983 claims.

The reason for our choice in *Beard* and *Teague* was two-fold. First, the Illinois statute of limitations which we selected over the two-year tort period specifically applied to statutorily created causes of action. *Beard, supra* at 335. Since plaintiff's rights in those cases were created by statute, *e. g.,* § 1981, Ill.Rev.Stat. ch. 83, § 16 was "most closely analogous" as required by *Johnson v. Railway Express Agency, supra.*

Secondly, we rejected the approach taken in *Jones v. Jones,* 410 F.2d 365 (7th Cir. 1969), *cert. denied,* 396 U.S. 1013, 90 S.Ct. 547, 24 L.Ed.2d 505 (1970), which examined the claimant's underlying facts and sought to analogize it to an appropriate common law action. *Beard, supra* at 336. In *Beard,* we stated that we preferred to "avoid the often strained process of characterizing civil rights claims as common law torts." *Id.* at 337.[6]

This case does not offer, however, the same choices as existed under Illinois law. The parties presented us with a choice between Indiana's 15-year residual statute, Ind.Code Ann. § 34–1–2–3 (Burns 1973) and a two-year statute applicable to actions for injuries to the person, character or personal property, and generally considered by Indiana courts as applicable to tort causes of action. Illinois' five-year residual statute, Indiana's 15-year statute is inappropriate and probably unworkable here.

In *Beard,* we noted that Illinois' five-year residual statute had been interpreted as applying to statutorily created causes of action. *Beard, supra* at 335. By contrast, the 15-year residual statute of limitations has been generally limited by Indiana's courts to real property claims. *See, e. g., Yarlott v. Brown,* 192 Ind. 648, 138 N.E. 17 (1923). No case law exists extending § 34–1–2–3 to statutory causes of action. *Gantt v. Bethlehem Steel Corp.,* 17 Emp. Practices D. ¶ 8502 (N.D.Ind.1978).

As both Judge Noland below, and Judge McNagny in *Gantt, supra,* have noted, serious problems would exist in production of proof if a 15-year statute of limitations were incorporated into section 1981 actions. Unfairness would exist in requiring employers to defend 15-year-old claims where the evidence would most likely be lost or destroyed. Moreover, given the fluidity of employee movement and change-over—particularly in a 10,000 + employee plant—there would be serious problems of witness availability.[7]

■ Comparing our situation at bar once more to *Beard* and *Teague,* there is a major difference in choosing between a two- and five-year statute as opposed to two- and 15-year limits. Moreover, while we realize that applying state statutes to federal causes of action necessarily results in some lack of uniformity, *Schiffman Bros., Inc. v. Texas Co.,* 196 F.2d 695, 698 (7th Cir. 1952), we must remember that state law is displaceable where its application is inconsistent with the federal policy underlying section 1981. *Johnson, supra* 421 U.S. at 465, 95 S.Ct. at 1722; *Beard, supra* at 334. Applying a 15-year statute in

---

**6.** In Illinois, different types of torts are subject to different periods of limitation: (1) one year for slander and libel, Ill.Rev.Stat. ch. 83, § 14; (2) two years for injury to the person, false imprisonment, malicious prosecution, abduction or seduction, *Id.* at § 15; (3) five years for injury to property or conversion of personal property. *Id.* at § 16. Thus, in *Beard* the problem was potential confusion resulting from selecting the tort most closely analogous to the type of injury alleged by a civil rights plaintiff and thus choosing the applicable period of limitations. This particular facet of the problem does not exist in Indiana where almost all types

of tort actions are subject to the two-year statute.

**7.** This distinction is in line with an analogous decision made by Indiana's legislature. Where proof problems on contracts are minimal, in written, integrated contracts, Indiana provides a 20-year statute of limitations. Ind.Code Ann. § 34–1–2–2(6) (Burns 1973). On general contract actions which must rely on parol evidence, people's memories and extraneous documents, however, Indiana applies a considerably shorter six-year period. Ind.Code Ann. § 34–1–2–1 (Burns 1973).

Indiana would extend the rights of that state's residents substantially beyond the maximum periods allowed in this and other circuits. *See, e. g., Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1970) (upholding choice of a two-year Virginia statute); *Zuniga v. AMFAC Foods, Inc.,* 580 F.2d 380 (10th Cir. 1978) (applying six-year limit); *Tatum v. Golden,* 570 F.2d 753 (8th Cir. 1978), *cert. denied,* 436 U.S. 960, 98 S.Ct. 3079, 57 L.Ed.2d 1127 (1978) (five-year statute); *Jones v. San Antonio,* 586 F.2d 1224 (5th Cir. 1978) (two-year Texas statute). All told, we find the 15-year statute of limitations encompassed in Ind. Code Ann. § 34–1–2–3 (Burns 1973) totally inappropriate for section 1981 actions. *See, Gantt v. Bethlehem Steel Corp.,* 17 Emp. Prac.D. ¶ 8502 (N.D.Ind.1978).

Although the parties did not raise the issue, we feel that a thorough analysis must include a discussion of the applicability of the six-year statute of limitations governing contractual actions. Ind.Code Ann. § 34–1–2–1 (Burns 1973). Federal District Judge McNagny chose that period in *Gantt v. Bethlehem Steel Corp.,* 17 Emp.Prac.D. ¶ 8402 (N.D.Ind.1978). He did so, however, where the claimant filed more than six years after the alleged injury. Thus, the important choice was between the 15-year residuary statute, which he properly rejected, and a six-year or shorter period, which he adopted, using Ind.Code Ann. § 34–1–2–1 (Burns 1973).

In our reasoning in *Beard, supra,* we noted that the choice of a statute of limitations under section 1981 (for discriminatory actions by private individuals) is essentially the choice to be made under 42 U.S.C. § 1983 (1976) (for discriminatory actions under color of state law). Consequently, in *Beard* we adopted the same statute of limitations for section 1981 actions in Illinois as we had adopted there for section 1983 actions in *Wakat v. Harlib,* 253 F.2d 59 (7th Cir. 1958). Similarly, this court has already adopted the two-year statute of limitations in Ind.Code Ann. § 34–1–2–2 (Burns 1973) for section 1983 actions. *Hill v. Trustees of Indiana University,* 537 F.2d 248, 254 (7th Cir. 1976) (Kunzig, J., concurring with Ste-

vens, Circuit Justice, concurring specially). Just as *Wakat's* choice governed *Beard's* decision, so does *Hill's* choice control the case at bar absent some more "closely analogous" statute. *Cf., Sacks Brothers Loan Co., Inc. v. Cunningham,* 578 F.2d 172 (7th Cir. 1978). But no such statute exists.

An analysis of other circuits' decisions is of little help. Generally, other courts have chosen a "contract" or "tort" statute; but, it was because that statute had been interpreted specifically to include actions based on statute. *Zuniga v. AMFAC Foods, Inc.,* 580 F.2d 380 (10th Cir. 1978); *Tatum v. Golden,* 570 F.2d 753 (8th Cir. 1978) (Iowa law); *Martin v. Georgia-Pacific,* 568 F.2d 58 (8th Cir. 1977) (Arkansas law). We still strive to adhere to *Beard* and avoid characterizing actions as common law torts. Yet, as this case indicates, when the general statute of limitations fails and no easy comparison exists, *cf., Green v. Ten Eyck,* 572 F.2d 1233 (8th Cir. 1978), some analogies must be used.

Making an analogy, plaintiffs' claims here fit better under the Indiana statute applicable to injuries to the person rather than the statute governing interference with contract.

Indiana's tort statute for "injuries to person or character," Ind.Code Ann. § 34–1–2–2 (Burns 1973) has been given a broad interpretation including abuse of process, *Cassidy v. Cain,* 145 Ind.App. 581, 19 Ind. Dec. 168, 251 N.E.2d 852 (1969), and loss of a spouse's services, *Merritt v. Economy Department Store,* 125 Ind.App. 560, 128 N.E.2d 279 (1955). By contrast, Indiana has limited its contract section, Ind.Code Ann. § 34–1–2–1 (Burns 1973) to actions based on a contract.

As another court stated, the "essential nature of the [civil rights] claim is the interference with . . . not the breach of a contractual obligation." *Ingram v. Steven Robert Corp.,* 419 F.Supp. 461 (S.D.Ala.1976), *aff'd* 547 F.2d 1260 (5th Cir. 1977) (applying statute for injuries to the person). *Cf., Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1970); *Partin v. St. Johns-*

*bury*, 447 F.Supp. 1297 (D.R.I.1978). In the case at bar, also the alleged damage was due to a violation of plaintiffs' personal rights to be free from racial and sexual discrimination. The actions were not based on a breach of contract. Thus, in our opinion, Indiana's two-year tort statute is more analogous than the six-year contract provision. *See Johnson v. Railway Express, supra.*

A recent Indiana Court of Appeals decision supports our conclusion. In *Merimee v. Brumfield*, 72 Ind. 765, 397 N.E.2d 315 (1st Dist. 1979), the court was required to construe the meaning of the phrase "personal injuries" in the context of Indiana's survival statute. Ind.Code Ann. § 34–1–1–1 (Burns 1973). The Indiana court read that phrase to include "injuries to the physical body, malicious prosecution, false imprisonment, libel, slander, *or any affront or detriment to the body, psyche, reputation or liberty."* *Merimee v. Brumfield*, 72 Ind. at 769, 397 N.E.2d at 318 (emphasis added). Seemingly, Indiana courts would read the phrase "personal injuries" in Ind.Code Ann. § 34–1–2–2 (Burns 1973), similarly since both phrases were placed in the two statutes simultaneously. *See* Indiana Acts of 1881 (Special Session), ch. 38, §§ 7, 38, p. 240. Interpreted to include "any affront or detriment to . . . reputation or liberty," § 34–1–2–2 seems most closely analogous to a claim based on "interference with a constitutionally protected right." *Ingram v. Steven Robert Corp.*, 419 F.Supp. 461 (S.D.Ala.1976), *aff'd* 547 F.2d 1260 (5th Cir. 1977).

The application of the tort period is further supported by two other statutory provisions. Another closely analogous statutory limitations period for section 1981 is found in Ind.Code Ann. § 22–3–9–8 (Burns 1973), also providing a two-year statute of limitations for employers' liability for injuries to employees. Certainly, the section 1981 actions are based on a violation of the employee's civil rights—an injury the employer inflicts upon the employee. Considering this analogous, the specific section's identical two-year period together with the tort section's two-year period supports the conclusion that a two-year period applies.

Moreover, since plaintiffs initiated their action, Indiana has enacted Ind.Code Ann. § 34–1–2–1.5 (Burns Cum.Supp.1978) in 1977. This new section now specifically provides a two-year period for *all* employment related actions. The recent statement by Indiana's legislature indicates its judgment that a two-year period is best applicable to employment related actions. Given the lack of any precisely analogous statute in state law, *cf., Curran v. Portland School Committee*, 435 F.Supp. 1063, 1080 (D.Me. 1977), we are reassured, by this later enactment, that our choice of the two-year "tort" period, Ind.Code Ann. § 34–1–2–2 (Burns 1973), is correct. *See, Gantt v. Bethlehem Steel Corp.*, 17 Emp.Prac.D. ¶ 8502 (N.D. Ind. 1978) (The new two-year employment related actions statute, Ind.Code Ann. § 34–1–2–1.5 (Burns Cum.Supp.1978) would control a § 1981 action if brought today).

In summary, after a careful examination of Indiana law and our precedents, including especially our adoption of a two-year statute in Indiana in a section 1983 setting, *Hill, supra*, we consider a two-year statute of limitations applicable to plaintiffs' section 1981 actions.

## II. PROOF OF DISCRIMINATION

The final subject to be discussed is the manner in which both sides attempted to use statistics to prove or disprove discrimination in the class action suits.

 Plaintiffs undertook to prove their claims of class-wide discrimination on the basis of data focusing on an instant in time (snapshot statistics). Plaintiffs would take a date, look at a job, and determine the percentage of women and minorities in that job at that instant compared to the percentages in the relevant workpool. Anytime the percentages of women and minorities in the "snapshot" were less than those in the workpool, plaintiffs considered themselves to have proven discrimination by defendant.

While plaintiffs are correct in using this method to make out their *prima facie* case, *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), defendants were entitled to rebut that *prima facie* case through more refined, accurate and valid statistics. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576–78, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978); *Teamsters v. United States*, 431 U.S. 324, 339, 360, 97 S.Ct. 1843, 1856, 1867, 52 L.Ed.2d 396 (1977). We find the district court was correct in relying on defendants' statistics.

■ Defendants submitted statistics depicting the "flow" of its workforce—the movement of personnel into and within the company. Thus these statistics showed the gains in employment women and minorities made from year to year. In other words, defendants showed the number of openings they had available for each type of position, the percentage of minorities or women in the relevant labor pool and, finally, the percentage of women and minorities actually hired for these openings. In so doing, defendants showed the actual hiring decisions made during the *relevant time periods*. As the record proves, GM's hiring at Allison plant illustrates the positive results of their affirmative action program. Women and minorities were actually hired and promoted at a greater rate than their percentages in the relevant workpools would have suggested.

■ Moreover, plaintiffs' snapshot statistics incorporate discriminatory impacts occurring before the relevant time frame, *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). Thus, given Congress' imposition of a statute of limitations for Title VII actions and direction to impose such limits for section 1981, *see*, 42 U.S.C. § 1988 (1976), defendants' approach emphasizing the day-to-day decisions made during the relevant period are better than plaintiffs', which include pre-statute of limitations actions by virtue of their use of cumulative statistics.

By relying on cumulative statistics alone, plaintiffs grouped defendants' hiring deci-

sions from 20–30 years ago with those of the last five years. Defendants could have hired all women and minorities for those jobs which opened during the relevant statutory periods, yet, because of the large number of existing non-minority male employees carried over from before, it would look as though defendant was still discriminating.

The residue of past discrimination is not immediately eliminated. In the instant case, it is more relevant to look not at a workforce makeup on a given day, but to the chances Allison had to change its percentage of women minorities through current hiring decisions. In so doing, we do not see a picture of a discriminatory employer during the relevant period, *supra* Part I.

■ All told, we conclude that Judge Noland treated the statistical evidence properly and agree that GM did not discriminate against the individual plaintiffs or classes they represent.

Accordingly, we concur with the determination of the district judge that plaintiffs' claims under Title VII and section 1981 were not proven. We have expanded to some degree his treatment of two major issues which we consider important: (1) threshold problems (the need of a right to sue letter under Title VII and, the appropriate Indiana statute of limitations to incorporate into section 1981); and (2) proof of discrimination (the correct means of using statistics). Additionally, to the extent not inconsistent with the above, we have adopted Judge Noland's Memorandum of Opinion and attach it as an appendix hereto.

The judgment of the district court is

Affirmed.

## APPENDIX

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

Movement For Opportunity And Equality, et al

vs.

Detroit Diesel Allison Division Of General Motors Corporation, et al

---

Nos. IP 73–C–412
IP 73–C–413

---

MEMORANDUM OF OPINION,
FINDINGS OF FACT AND
CONCLUSIONS OF LAW
MEMORANDUM OPINION

This action was commenced by the plaintiffs on August 23, 1973. An amended complaint was filed on January 17, 1977. The action presents claims for relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and under 42 U.S.C. § 1981. Plaintiffs, Movement for Opportunity and Equality (M.O.E.) and nine individual present and former employees of defendant, brought this action on their own behalf and on behalf of other persons similarly situated pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. Defendants are Detroit Diesel Allison Division of General Motors (Allison), Local 933 United Automobile, Aerospace and Agricultural Implement Workers of America (Local 933), and International United Automobile, Aerospace and Agricultural Implement Workers of America-U.A.W. (U.A.W.).

The complaint alleged both individual and class claims against all defendants. The class claims against Allison are as follows:

1. Discrimination against females in the hiring of employees.
2. Discrimination against blacks in the hiring of salaried employees.
3. Discrimination against black and female employees in assignment to jobs.
4. Discrimination against black and female employees in selection for the EIT training program.
5. Discrimination against black and female employees in promotion to the position of Group Leader.
6. Discrimination against black and female employees in the denial of job transfers and advancement through the operation of the seniority system.
7. Discrimination against black and female employees in the selection of foreman, general foreman, and superintendents.
8. Discrimination against black and female employees and applicants in the application of educational criteria for selection into salaried positions.
9. Discrimination against black and female salaried employees in promotions.
10. Discrimination against black and female employees in salaried income.

The class claims against Local 933 and the U.A.W. allege they have failed to fairly represent blacks and females as follows:

1. Discrimination against blacks and females by negotiating and entering into collective bargaining agreements which have the intent and effect of denying blacks and females equal employment opportunities.
2. Discrimination against blacks and females by refusing to process grievances on their behalf on the same basis as for white males.
3. Failing to act affirmatively to cause the employer to refrain from discriminating against blacks and females because of their race and sex.
4. Failing to effectively represent blacks and females by passively permitting the employer to discriminate against blacks and females because of their race and sex.

All of these claims are alleged to violate both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. On November 14, 1977, the Court granted plaintiffs' motion for class certification pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, the class being described as:

"[A] class of black and female employees of the defendant corporation who have been adversely affected by one of the following alleged practices of the defendants:

1. Discrimination against black and female employees in assignment to jobs.
2. Discrimination against black and female employees in selection for the EIT training program.
3. Discrimination against black and female employees in promotion to the position of group leader.
4. Discrimination against black and female employees in the denial of job transfer and advancement through operation of the seniority system.
5. Discrimination against black and female salaried employees in promotions."

This certification has not been challenged by the parties.

The claims of the individual plaintiffs against Allison, Local 933 and the U.A.W. are as follows:

1. Discrimination against Glenn L. Howard, a black male, by denial of disability benefits because of his race and retaliation against Howard through refusal to recall him from layoff and other retaliatory acts due to his filing of charges of racial discrimination. Howard received a right-to-sue letter on July 23, 1973 in response to charges filed with the EEOC on November 27, 1972 and June 14, 1973.

2. Discrimination by Allison against Beulah M. Wallace, a black female, in refusing to upgrade her to positions to which she was entitled by seniority because of her race and sex and by harassing her because of her race and sex. Wallace received a right-to-sue letter on July 23, 1973, in response to charges filed with the EEOC on August 13, 1970. February 17, 1972, March 31, 1972, July 31, 1972 and November 8, 1972.

3. Discrimination against Johnny Castille, a black male, in laying him off because of his race and denying him promotions because of his race. Castille received a right-to-sue letter on July 23, 1973, in response to charges filed with the EEOC on January 24, 1972 and February 7, 1973.

4. Discrimination by Allison against Kenneth A. Bebley, a black male, in an award given under the General Motors Suggestion Plan because of his race. Bebley received a right-to-sue letter on July 23, 1973, in response to charges filed with the EEOC on October 1, 1970.

5. Discrimination by Allison against Roosevelt Mason, a black male, by harassment and discipline and acquiescence thereto because of his race. Mason received a right-to-sue letter on July 23, 1973 in response to charges filed with the EEOC on May 4, 1970.

6. Discrimination by Allison against Delores H. Dungey, a black female, in promotion and through harassment because of her race and sex. Dungey received a right-to-sue letter on July 23, 1973, in response to charges filed November 9, 1971.

7. Discrimination against Herman Test, a black male, by bumping him from an upgrade by grievance and not processing his grievance to this action, by denying him overtime, and by assigning him to unfavorable assignments all because of his race. Test received a right-to-sue letter on August 13, 1973 in response to charges filed with the EEOC on November 14, 1972. On December 5, 1977, Geneva Test, administratrix of the estate of Herman Test, was substituted as party plaintiff for Herman Test, deceased.

8. Discrimination by Allison against James Fletcher, a black male, by refusing to approve his application for promotion, refusing to promote him, unlawfully discharging him, and by harassing him all because of his race.

9. Discrimination by Allison against Willie G. Griffin, a black male, by denying him entry into a skilled trades program and by denying him

the benefits of seniority, particularly in regard to overtime work, all because of his race.

10. Injury to M.O.E. is alleged derivatively through the detrimental effect upon its ability to raise funds and protect its members from employment discrimination which resulted from the alleged discrimination of the defendants against its members.

Defendants denied all allegations of discrimination. Trial of this action to the Court without a jury commenced on December 5, 1977, and concluded on December 21, 1977. Motions to dismiss were granted for Local 933 and the U.A.W. at the conclusion of plaintiffs' case in chief, the Court having found the plaintiffs had failed to sustain their burden of proof with respect to allegations of discrimination against them. The Court has now determined that defendant Allison is entitled to judgment as well. As detailed below the Court finds the evidence overwhelming in its support of Allison's efforts to provide equal opportunity for minority and female employees throughout its operations. The record is replete with evidence of its efforts to comply with numerous governmental affirmative action requirements as well as Title VII. This Court finds it to be clear that Allison has in no way discriminated against any of these plaintiffs or against any members of the class they represent.

## I. RELEVANT EMPLOYMENT DECISIONS

The record in this action is voluminous and includes evidence relating to the individual claims as well as statistical and other documentary information relative to Allison's employment decisions from 1958 through 1977. It is necessary, therefore, to determine the time limitations relevant to this lawsuit under both Title VII of the Civil Rights Act of 1964 (Title VII), and 42 U.S.C. § 1981 (§ 1981) as to each individual and each class claim.

## TITLE VII

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) sets two jurisdictional prerequisites to instituting an action under Title VII: (1) timely filing a charge of employment discrimination with the EEOC and (2) timely action upon receipt of the EEOC notice of right-to-sue. *Id.* at 47, 94 S.Ct. at 1019. The charge which *Alexander* requires must itself be filed with the EEOC within 180 days after the alleged unlawful employment practice occurred or 300 days thereafter if a charge has first been filed with a state agency. Though no direct allegation is made that charges were filed with the Indiana Civil Rights Commission, the Court takes notice of the limitation upon the EEOC in 42 U.S.C. § 2000e–5(c) which requires deferment to a state agency where one exists as it does in Indiana. The Court will therefore apply the 300 day requirement to each charge to determine the earliest date for which evidence may be reviewed in this action under Title VII.

Application of this period to the individual claims is relatively simple, but discussion of the class claims requires a determination of which individual charges apply to which class claims in order to determine the earliest charge filed relative to each class. It is not necessary that each class member have filed a charge with the EEOC, *Bowe v. Colgate Palmolive Co.*, 416 F.2d 711, 720 (7th Cir. 1969); however, only those who could have filed a charge at or after the time a charge was filed by the class representative can be included in the class. *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 246 (5th Cir. 1975); *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Coppotelli v. Howlett*, 76 F.R.D. 20 (E.D. Ill. 1977). This is necessary to satisfy the notice requirement of the EEOA for the accused employer. Class membership as certified must, therefore, be redefined for purposes of decision. The applicable period of inquiry will commence 300 days prior to the earliest charge filed relevant to a particular class claim.

The final issue to be resolved under Title VII's application in this lawsuit is the effect

of two efforts by Beulah M. Wallace to bring discrimination at Allison before various public agencies in 1965 and 1966. This issue is important not only to the individual claim of Mrs. Wallace but also the class claim for denial of promotion in hourly jobs on account of race and sex since that is the charge made in these efforts. Two requirements must be met in order to provide an avenue to the federal courts: A charge before the EEOC and the issuance of a right-to-sue letter. *Alexander, supra* 415 U.S, at 47, 94 S.Ct. at 1019.

The defendant argues that neither requirement has been met. In regard to the 1965 activities of Mrs. Wallace no direct contact with the EEOC was shown. She testified that she had sent a copy of the complaint she filed with the Indiana Civil Rights Commission (ICRC) to the EEOC in Washington but no formal charge was ever made requesting action by the EEOC. Forwarding a copy of a state complaint to the EEOC does not constitute filing a charge therewith. *Moore v. Sunbeam Corp.*, 459 F.2d 811, 822 (7th Cir. 1972). The ICRA determined no probable cause existed to suspect discrimination and took no further action.

In 1966 Mrs. Wallace wrote directly to the EEOC to charge discrimination in regard to hourly promotions. Per statutory and regulatory requirements in effect at that time the EEOC referred the charge to the ICRA and notified Mrs. Wallace that if the state commission's action was unsatisfactory she should re-contact the EEOC. The defendants contend that Mrs. Wallace's failure to re-contact the EEOC in order to file a new charge precludes any action by this Court on the basis of the initial letter. The EEOC now has a procedure for holding a charge in abeyance until action by the state has terminated without requiring a new charge to be filed at that time. In the absence of such regulation in 1966 the defendants contend no such "abeyance" was permissible.

The Supreme Court, however, in *Love v. Pullman*, 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). recognized such a procedure where a 1966 letter, pre-dating Mrs. Wallace's letter, was sent to the EEOC and referred to a state agency. "[W]e cannot agree with the respondent's claim that the EEOC may not properly hold a complaint in 'suspended animation', automatically filing it upon termination of the state proceedings." *Id.* at 526, 92 S.Ct. at 618. In *Love* the EEOC upon notice from the state that it would take no further action investigated the complaint, found probable cause, and was unsuccessful in its attempt to gain voluntary compliance. In the case before this Court it appears no further action was taken on Mrs. Wallace's letter even though the ICRA referred the matter to the EEOC. There is no indication in the EEOC's file relative to Mrs. Wallace, which was submitted into evidence by the plaintiffs, that any action was taken in regard to the 1966 letter or that any notice was given to Allison that a charge had been filed. A "complainant should not be made the innocent victim of a dereliction of statutory duty on the part of the Commission," *Choate v. Caterpillar Tractor Co.*, 402 F.2d 357, 361 (7th Cir. 1968). The EEOC had no real duty to act until it received a further charge from Mrs. Wallace; but this discussion indicates this Court should not too quickly allow technical errors to obscure the path of plaintiff's recovery in this type of action.

The Court will assume the 1966 letter can serve as a proper charge in this action and will proceed to consider the other prerequisite to a Title VII action, issuance of a right-to-sue letter by the EEOC. Mrs. Wallace received a right-to-sue letter on July 23, 1973 which included a designation of the five charges to which it related. These charge numbers relate to charges filed by Mrs. Wallace from 1970–1972, but make no reference to either of her earlier claims. *Gibson v. Kroger Co.*, 506 F.2d 647, 652 (7th Cir. 1974), *cert. denied* 421 U.S. 914, 95 S.Ct. 1571, 43 L.Ed.2d 779 (1975), following *Stebbins v. Continental Insurance Co.*, 442 F.2d 843 (D.C.Cir.1971), held that a plaintiff had a duty to seek a right-to-sue letter from the EEOC in the absence of "special circumstances which might have made it a hardship." There is no evidence in the record

suggesting Mrs. Wallace sought such a letter or that doing so would have caused her any hardship.

Further, neither the complaint nor the amended complaint indicated the plaintiffs would assert the 1966 letter served as a charge which could provide jurisdiction to the court over events which occurred more than seven years prior to the commencement of this action. To allow the plaintiffs to avoid this prerequisite would not serve the overriding purpose of the EEOC of providing a means for private conciliation of such disputes and notice to the accused employer sufficient to enable it to preserve necessary records relevant to the charge. The Court, therefore, will disregard the 1965 and 1966 actions by Mrs. Wallace in its determination of the appropriate time period for review of the defendants' actions under Title VII.

### 42 U.S.C. § 1981

Having determined the time period relevant to the Title VII claim it remains to be determined what period is relevant to the § 1981 claims and how that period might alter the overall scope of this action. It must first be noted that § 1981 applies only to discrimination on the basis of race and will not expand the time periods for purposes of the sex discrimination claims properly cognizable under Title VII. *Runyon v. McCrary*, 427 U.S. 160, 167, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). In determining which time period is appropriate for the race discrimination claims this Court must follow the mandate of the Supreme Court in *Johnson v. Railway Express Agency*, 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975):

> "Since there is no specifically stated or otherwise relevant federal statute of limitations for a cause of action under § 1981, the controlling period would ordinarily be the most appropriate one provided by state law."

In *Runyon v. McCrary*, 427 U.S. 160, 181, 96 S.Ct. 2586, 2600, 49 L.Ed.2d 415 (1976) the Court further stated:

> "In other situations in which a federal right has depended upon the interpretation of state law, 'the Court has accepted the interpretation of state law in which the District Court and the Court of Appeals have concurred even if an examination of the state law issue without such guidance might have justified a different conclusion.'"

These cases are cited in order to put into proper perspective the task before the Court. No reported decisions have been found indicating a resolution between the District Courts and the Court of Appeals in this circuit of which Indiana statutory period should apply to employment discrimination actions. The leading cases in this circuit determine the limitation to be applied in Illinois under that state's statutory scheme. In those cases a five-year general statute has been applied in light of the Illinois court's use of that statute for other statutory remedies where no specific statute of limitations is provided. *Beard v. Robinson*, 563 F.2d 331, 336 (7th Cir. 1977).

In the absence of a similar interpretation as to the statutory remedies by an Indiana court, this Court is forced to choose between the Indiana general statute of limitations, similarly worded to Illinois' five-year provision, and its tort statute. Though the Court of Appeals in this circuit has rejected the analogy between the tort cause of action and the employment discrimination suit, *Teague v. Caterpillar Tractor Co.*, 566 F.2d 7, 8 (1977), that was in the context of the Illinois scheme where the alternative was a more workable five-year period. Here the only alternative to the two-year limitation for tort actions, I.C.1971 34–1–2–2, is the fifteen years allowed for "[A]ctions not limited by any other statute . . . .", I.C.1971 34–1–2–3. This alternative may make the use of the tort period less undesirable. Such may have been implied by a recent opinion of the Court of Appeals in this circuit which, though striking down the use of the tort period in a suit against a public official in light of Indiana's five-year provision dealing with that specific topic, recognized this Court's application of the tort statute to an employment discrimina-

tion case. *Sacks Brothers Loan Co. v. Cunningham*, 578 F.2d 172, 176 n.13 (1978). Since the purpose of a statute of limitation is repose in the defendant, the distinction made there between an employment discrimination action and a suit against a government official does no violence to the desire expressed in *Beard* for a uniform statutory period within a state for civil rights actions. If a different period is applied on the basis of the type of defendant, potential defendants are on notice of the period which applies to them. If a distinction is allowed on the basis of the nature of the claim such defendants have different periods for different possible civil rights claims. Thus application of the tort statute here is consistent with the holdings in *Sacks Brothers* and *Beard*.

On three previous occasions this Court has applied the Indiana tort statute to employment discrimination actions, *Parrish v. Kroger*, No. IP 77–460–C (November 17, 1977); *Moreno v. Kroger*, No. IP 76–417–C (November 19, 1976); *Taylor v. Detroit Diesel Allison Division of General Motors*, No. IP 76–472–C (August 14, 1978). This choice seems the more appropriate one for several reasons.

First, the nature of this type of action is such that a heavy reliance must be placed upon the evaluation of subjective employment decisions. An employer must provide equal opportunities as to all its employees but in the absence of a preference for blacks or women (42 U.S.C. § 2000e–2(J)) the ultimate decisions are necessarily subjective and can only be reviewed where sufficient information exists. To apply a fifteen-year statute of limitations to a dispute requiring evidence of personal observations and evaluations places a difficult burden of production and proof on the parties. Particularly where, as here, the evidence on one side is likely to be more objectively observable than that on the other. Plaintiffs seek to raise the inference of discrimination from the use of statistical information while the defendants must rebut that inference through evidence of a nondiscriminatory purpose. Decision-makers change jobs, leave the company or otherwise become unavailable so that unless a burdensome record retention requirement is placed upon the employer necessary evidence will be unavailable as well.

Second, in light of the choice which is before the Court between a relatively short period as opposed to the long general time period, it seems appropriate to note the statutory time periods provided for such civil rights actions in other contexts. The Indiana Civil Rights Law, I.C.1971 22–9–1, provides a ninety day period in which complaints may be filed with the Indiana Civil Rights Commission. I.C.1971 22–9–1–3(*o*). The Equal Employment Opportunity Act provides a 180 day period, 300 if filed with a state agency, to file a charge with the EEOC. Several Courts of Appeal have upheld similar periods for civil rights actions. *See, Gonzalez v. Santiago*, 550 F.2d 687 (1 Cir. 1977); *Howell v. Cataldi*, 464 F.2d 272 (3 Cir. 1972); *Patterson v. American Tobacco Co.*, 535 F.2d 257 (4 Cir. 1976); *Ingram v. Steven Robert Corp.*, 547 F.2d 1260 (5 Cir. 1977); *Marlowe v. Fisher Body*, 489 F.2d 1057 (6 Cir. 1973); *Crosswhite v. Brown*, 424 F.2d 495 (10 Cir. 1970). Finally though it can have no controlling effect in this action it is worth note that in 1977 Indiana passed a new statute providing a two-year limitation for: "[A]ll actions relating to the terms, conditions, and privileges of employment." I.C. 34–1–2–1.5. This statute indicates the intent of the Indiana legislature that a relatively short period is appropriate in actions relating to employment decisions.

Finally, the Court notes the application of a two-year limitation to this action will limit the plaintiffs' § 1981 claim to actions occurring after August 23, 1971. The EEOA limits noted above will allow an earlier time period as to some of the claims thus mitigating the shorter period somewhat. More importantly there was very little evidence offered by plaintiffs relative to periods prior to 1970. Any finding relative to that period would be difficult due to the plaintiffs' failure to provide adequate information, thus there would seem to be little harm from this Court's decision to apply the two-year tort limitation found in the Indiana Code.

### Employment Decisions Prior to the Limitations Period

"A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *United Airlines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977).

This citation indicates the Court must find that discriminatory conduct on the part of the defendants took place subsequent to the statutory periods determined as outlined above. In reviewing the evidence of discrimination it is therefore necessary to determine when the underlying employment decisions were made in order to limit the Court's determination to only those employment decisions relevant under the statutory limitations outlined above.

## II. CLASS CERTIFICATION

On November 14, 1977, this Court certified five class claims for adjudication in this action allowing plaintiffs to represent all black employees and all female employees of Allison who were employed on July 2, 1965, or at any time thereafter, or who may be employed in the future, who have been or may be adversely affected by discrimination against black and female employees in assignments to jobs, by discrimination against black and female employees in selection for the EIT training program, by discrimination against black and female employees in promotions to the position of group leader, by discrimination against black and female employees in the denial of job transfer and advancement through the operation of the seniority system, and by discrimination against black and female salaried employees in promotions.

Rule 23(a) of the Federal Rules of Civil Procedure provides four prerequisites to a class action:

"(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

The issue of joinder in this action was obvious from the beginning in light of the size of Allison's operation. The plaintiff demonstrated the potential size of the putative class through statistics showing the number of black employees in the hourly work force who may have been affected by discrimination in job assignment, promotion or other form of advancement.

The question of commonality of issues was raised by the defendant in its brief in opposition to class certification on the basis of the diversity of the class claims. Though not accompanied by a motion to sever the various class claims the defendants, in effect, sought to question the joinder of these individual claims under Rule 20, through this objection to class certification. *Thompson v. Board of Education of Romeo Community Schools*, 71 F.R.D. 398, 412 (W.D. Mich.1976) held that Rules 20 and 23 are exclusive of one another so that satisfaction of one in a given situation will obviate the need to discuss the other. That case did not involve multiple class claims, however, so that the question in this action seems to be unique.

Rule 23 speaks in terms of "questions of law or fact common to the class" which was satisfied in this action as to the individual class members within each class in terms of the type of discrimination alleged and the nature of the evidence presented; but Rule 20 speaks in terms of "the same transaction, occurrence, or series of transactions or occurrences" in addition to commonality of law or fact. It has been held that this provision affords the District Court great discretion in determining the scope of a civil action. *Mosely v. General Motors Corp.*, 497 F.2d 1330, 1332 (8th Cir. 1974). Here the claims are based upon voluminous evidence of a statistical nature which places a heavy burden on individual plaintiffs to

present their case and upon the defendants to analyze and rebut it. In light of these burdens the Court finds joinder is proper in this type of action in order to allow the two sides to fully express their position on the principal underlying issue of discrimination.

In light of the requirement that the claims of the representative plaintiffs are typical of the claims of the class the Court found it necessary to reduce the number of separate class claims. In *Jenkins v. Blue Cross Mutual Hospital Insurance, Inc.*, 522 F.2d 1235 (7th Cir. 1975), *reheard en banc*, 538 F.2d 164 (1976), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976), the Court held that class claims under Title VII or 42 U.S.C. § 1981 can only be brought by one who has suffered the same injury which is alleged to have been suffered by the class. "We agree with the district court, however, that the failure of the plaintiff to allege sex discrimination in her charge before the EEOC precludes her from raising the issue in this proceeding." *Id.* at 1239. "The plaintiff must be a member of the class which she seeks to represent (under § 1981) with sufficient interest in the outcome to assure that she will adequately and fairly represent the class." *Id.* at 1240.

Here in reviewing the charges before the EEOC the Court found that none had been filed with respect to five of the plaintiffs' claims: discrimination against females in hiring, discrimination against blacks in the hiring of salaried employees in the selection of foreman, general foreman, and superintendents, discrimination against black and female employees and applicants in the application of educational criteria for selection into salaried positions, and discrimination against black and female employees in salaried income. A review of the plaintiffs' individual claims in the complaint and at trial also reveals no allegation of discrimination in any of these forms.

The Court further notes at this time that the classes relative to discrimination in salaried job assignment, promotion of salaried employees and promotion of hourly employees to the Employees in Training Program must be limited to black employees due to the lack of any EEOC charge relative to sex discrimination and the inapplicability of § 1981 to such claims. The only charge to the EEOC by a salaried employee was made by Delores H. Dungey on December 10, 1971. The defendants assert this charge does not raise issues of sex discrimination and therefore cannot support a class claim on that issue. Of particular interest in this area is *Jenkins v. Blue Cross*, 538 F.2d 164 (7th Cir. 1976), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976). There as here a charge was filed by a black woman but only the "Race or Color" box was checked on the form to indicate the type of discrimination asserted. The Court there held such formality to be insufficient to bar a sex discrimination claim and proceeded to analyze the description of the claim to find any indication that sex discrimination was also alleged. *Id.* at 167. Applying a similar scrutiny to the charge filed by Mrs. Dungey, it is apparent her claim only goes to racial discrimination. "Denied job promotions which were given to white woman," is the opening claim and the entire discussion suggests only a denial of job assignments and promotions because of her race. The July 31, 1972 charge of Beulah Wallace relative to promotion and advancement of black hourly employees suffers a similar limitation as that of Mrs. Dungey. No allegation of sex discrimination is contained therein and its wording clearly limits its application to claims of racial discrimination.

In addition the class including black and female hourly employees who suffered discrimination in initial job placement must be dismissed due to lack of a class representative. It was argued at the time of class certification that Beulah Wallace, through her July 31, 1972 charge to the EEOC, provided a representative for this class. In reviewing that charge the Court can find no claim of discrimination in initial placement. Further the Court finds that even if such a claim is made it is improper as an EEOC charge given the longevity of service of this plaintiff with Allison. In 1972 she had been employed by Allison for twenty-eight years and had been promoted from her initial job

assignment nine years earlier. Any wrong which may have occurred in her initial assignment pre-dated the EEOC and the limitations period applicable to this action. A review of all other named plaintiffs leads to the same result. None filed a charge with the EEOC on this point and all began employment and had been promoted more than two years prior to the initiation of this action with the exception of Johnny Castille whose two-year layoff delayed the promotion he received upon return.

■ Rule 23(c)(1) of the Federal Rules of Civil Procedure states that a certification order "may be altered or amended before the decision on the merits." The discretion to so alter was recognized by then Circuit Judge Stevens in *Jimenez v. Weinberger*, 523 F.2d 689, 697 (7th Cir. 1975). Though the Court feels a need to construe the class action provisions broadly in this type of action due to the expense and complexity of such litigation, it feels it has a duty also to protect the potential members of the class. This can only be done by assuring adequate representation of their interests. The original class relative to initial job placement must, therefore, be amended to include only black salaried employees.

Finally it must be found that the plaintiffs will fairly and adequately protect the interests of the class. This logically flows from the discussion above relative to the plaintiffs themselves being part of the class they represent. In the absence of a showing of bad faith or incompetence the Court had no difficulty in sustaining their competence as representatives of the class.

### III. STANDARDS OF LIABILITY

This action creates many complexities in terms of liability due to the dual basis of recovery, the diverse defendants, and the pursuit of class as well as individual claims. It is first important to note that this is principally a disparate treatment case as opposed to disparate impact. The only allegations which can reasonably be construed as disparate impact pertains to the seniority system. This claim, which is specifically dealt with in Title VII as interpreted by the Supreme Court in *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 1860–1865, 52 L.Ed.2d 396 (1977), will be dealt with separately as the standard applied thereto is somewhat unique. In determining the standard of proof placed upon the plaintiffs in their various disparate treatment claims it is necessary to make the distinctions noted above simultaneously. For the sake of clarity, a division of the various categories may be helpful.

### U.A.W.

■ First, the Court notes that no charge was ever filed with the EEOC in relation to the U.A.W., therefore, no Title VII claim can be pursued against that international union. Further, the requested class certification included only the claims in the complaint against Allison so that no certification of the class claims against the unions has ever been requested or approved. Thus, only those individual claims under § 1981 which implicate the U.A.W. remain to be resolved.

Only two individual plaintiffs asserted claims against the unions in the amended complaint and these allege retaliation for efforts to correct perceived instances of discrimination and failure to process a grievance. Both of these acts appear to be local occurrences not implicating the international union; therefore, only the implication remains that the U.A.W. has failed to police and control its local union. In *Kaplan v. I. A. T. S. E.*, 525 F.2d 1354, 1360 (9th Cir. 1975), the Court held that the international union was so involved in the local enforcement of the collective bargaining agreement that it could be held to be a party to any discriminatory acts shown on the local level. This Court will apply this "substantial involvement" standard in reviewing the two individual claims which remain to be resolved.

### LOCAL 933

Though three of the individual plaintiffs did file a charge with the EEOC against Local 933, thus preserving their Title VII

claims, only two have alleged discriminatory acts against the unions in the amended complaint. An additional plaintiff has alleged discrimination by the union in the amended complaint which can be reviewed under § 1981. The claim of plaintiff MOE against the union is derivative to wrongs done, if any, to its individual members. Since no effort was made to certify class claims against the unions, only these individual claims remain. The Court will review the testimony of these individuals and any other evidence relating to the events upon which they base their claim in order to determine whether they have been treated differently by the union on account of their race. With necessary adjustments due to the nature of the claim, the standard to be applied is found in *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The plaintiff must prove that he belongs to a racial minority, that he requested action by the union, that despite the propriety of his request he was refused, and that others of a different race making similar requests were aided by the union.

### ALLISON

In determining the standards to be applied to the employment decisions of Allison the standard for disparate treatment must be analyzed in regard to both Title VII and § 1981 for the individual claims as well as the class claims.

#### A. Individual Claims

The individual claims against Allison cover a full range of allegations which must be dealt with one by one; however, the general pattern which the proof in such claims must meet is analogous to the *McDonnell Douglas* approach: (1) Member of a racial minority or being female, (2) Application and qualification for a job Allison sought to fill, (3) Rejection, (4) Continued search for a person to fill the job after rejection of complainant. *See also: Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). The Court in *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 1866 n.44, 52 L.Ed.2d 396 (1977), explains the reasoning behind *McDonnell Douglas*:

"Although the *McDonnell Douglas* formula does not require direct proof of discrimination, it does demand that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought. Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one."

This indicates that the specific standard in *McDonnell Douglas* should be applied to other actions by evaluating the possible routine responses of the employer to such claims and requiring the plaintiff to eliminate them as justifications for rejection in order to establish a prima facie case.

Once plaintiff has eliminated these routine responses the burden is shifted to the employer to "rebut that inference by offering some legitimate, nondiscriminatory reason for the rejection." *Id.* 97 S.Ct. at 1866. This is the approach the Court will apply to the individual Title VII claims in this case. If a plaintiff has failed to meet this burden a prima facie case may only be shown by proof of specific intent to discriminate on the part of Allison since the *McDonnell Douglas* formula merely provides an inference of this necessary showing of intent.

The question remains whether this same standard is applicable to the individual claims under § 1981 as well since both *McDonnell Douglas* and *Teamsters* were limited to claims under Title VII. Though the standard to be applied might generally be assumed to be the same, *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), raises a doubt as to whether that is the case. There the plaintiff was required to prove discriminatory intent under § 1981 where disparate impact was alleged through the use of a written personnel test even though no such intent is

required under Title VII. Two distinctions exist between these proceedings and *Washington*: Disparate treatment as opposed to disparate impact and private employment decisions as opposed to those of a governmental institution.

*Croker v. Boeing Co.*, 437 F.Supp. 1138, 1181 (E.D.Pa.1977), which was substantially similar to this action, applied *Washington* and required a showing of a specific intent under § 1981 without reference to the distinctions noted above. This Court must respectfully question that result in light of the following language in *Washington*:

"But our cases have not embraced the proposition that a *law or other official act*, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact." (First emphasis supplied). *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).

It seems clear that the Court placed major emphasis on the nature of the defendant in that action. Here the defendant is a private party so that it is not clear that the logic of *Washington* should apply.

Even if applicable the question here is not the same as that faced by the Supreme Court. In *Washington* the Court was forced to accept the "no intent" Title VII disparate impact standard or provide for a specific showing of intent through a separate § 1981 standard. Here the Title VII disparate treatment standard itself requires intent, with the aid of the *McDonnell Douglas* inference; therefore it is only necessary for this Court to determine whether that inference can be constitutionally applied to a § 1981 claim. The defendants have provided the Court with no controlling authority and the Court can find no reason in logic to deny such application; therefore, the same standard as that outlined above for Title VII will be applied to the individual claims under § 1981.

### B. Class Claims

Having set the standard by which the individual claims are to be evaluated it remains to determine how this standard will vary in regard to the class claims. The plaintiffs seek in their amended complaint injunctive relief from the "policy, practice, custom, or usage" of the defendants in discriminating against them and alleges that Allison is engaging in ten unlawful "practices." This indicates the plaintiffs assert a "pattern or practice" type of action similar to that in *Teamsters*.

"At the initial, 'liability' stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant." *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 1867, 52 L.Ed.2d 396 (1977).

The fact that the government was the plaintiff in *Teamsters* is of no significance since that case relied heavily upon *Franks v. Bowman*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) where a private class action was pursued. This excerpt indicates the burden on plaintiffs is to show not only that they were mistreated but that a policy existed which resulted in such mistreatment on a class wide basis.

The issue of intent is once again raised in determining whether plaintiff has met its burden. The basic allegation in regard to four of the class claims is similar in nature to the hiring claim in *McDonnell Douglas*. The claims in regard to assignment to jobs, selection for the EIT program, promotion in salaried jobs, and promotion to group leader all involve the effort by employees to be accepted into new positions. As in *McDonnell Douglas* the plaintiffs must show intent to discriminate and may raise that inference by showing all four elements of the formula there applied. That formula as modified for a class action and applied under Title VII and § 1981 requires a general showing that such positions were available,

that the members of the class were generally qualified for those positions and that Allison did in fact fill the positions with non-protected employees. These are the issues proven in *Teamsters* by statistics and by direct evidence of the personal experience of applicants and employees. This evidence is necessary to "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Teamsters, supra* 97 S.Ct. at 1855. Once this showing has been made "the burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiff's] proof is either inaccurate or insignificant." *Teamsters, supra* at 1867.

The fifth class claims relates to the seniority system and its affect upon class members at Allison in regard to job transfers and promotion in hourly employment. Of course, § 703(h) of Title VII exempts bona fide seniority systems from the operation of that Title. The plaintiffs assert the provision in the national labor agreement is not a valid seniority provision under *Stewart v. General Motors Corp.*, 542 F.2d 445 (7th Cir. 1976). There seniority was held to be only ancillary to the selection of hourly clerks and thus not protected by § 703(h); but, unfortunately, the Court felt no need to elaborate upon the facts in order to indicate when seniority will be deemed to be ancillary. Here ¶ 63b of the national agreement reads in relevant part as follows:

> "In the advancement of employees to higher paid jobs when ability, merit and capacity are equal, employees with the longest seniority will be given preference."

The only complaint which can arise is that straight seniority may be overcome by the "ability, merit and capacity" of the applicants; but this can be no complaint at all.

> "Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or

because he is a member of a minority group." *Griggs v. Duke Power Co.*, 401 U.S. 424, 427, 430–31, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). *See also, Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

Further this Court finds the use of a merit system to override seniority may potentially be a great service to those who decry their lack of seniority due to past discrimination since this provides to them an avenue for overcoming that past injustice. The Supreme Court has made it clear that in order to invalidate a seniority system the plaintiff must show that it was designed to intentionally discriminate. *Teamsters, supra* 97 S.Ct. at 1863.

This higher standard requiring intent in the formulation of the system will be applied to the facts of this case relative to the class claim of discrimination through operation of the seniority system; however, where an employee was transferred or promoted because of greater ability merit and qualifications that employment decision is not protected by the seniority system itself and must be scrutinized along the same lines as the other four class claims. The Court will, therefore, review the evidence in two phases: (1) Was the seniority system established with the intent of discriminating against black and female employees or does it merely perpetuate any discrimination which may have occurred prior to the relevant time period of this action as found permissible in *Teamsters*; (2) When ability, merit and competence was used to override the seniority system were qualified black and female applicants disparately treated.

## IV. STATISTICAL EVIDENCE

Before presenting the Court's findings of fact and conclusions of law it is necessary to discuss in some detail the use of statistical evidence. As in most actions of this type the plaintiffs rely heavily upon statistical disparities between the employee composition of various jobs at Allison and the composition of the surrounding community to prove their class allegations. The initial issue to be resolved is how these statistical

comparisons may be used and what force they will have. The defendant refers the Court to numerous cases indicating that various discrepancies in the statistical comparisons will undermine plaintiffs' prima facie case; however, these cases, with few exceptions, were all decided prior to the Supreme Court's elaboration upon this issue in *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

In *Hazelwood*, the Court of Appeals had reversed the District Court's finding of no discrimination relying upon statistics which failed to provide an accurate community composition for comparison. The Court of Appeals, comparing census figures for black teachers in the area to Hazelwood's percentage of black teachers entered a judgment for the government upon its finding of an unrebutted prima facie case. Two types of deficiency in the statistical evidence were challenged: 1) The pool of labor utilized by the Court for comparison with the composition of Hazelwood's teaching staff and 2) The inclusion of employment decisions which occurred prior to the time period encompassed by that cause of action. The disposition of these two district deficiencies by the Supreme Court suggests a distinction must be drawn by this Court as it reviews the various allegations of deficiency raised by defendants here.

The District Court in *Hazelwood* was ordered to review the question of which labor pool was best suited for comparison in order to test the probative value of the plaintiff's statistics. If an improper pool was utilized the statistics have no value and fail to establish a prima facie case. This conclusion is buttressed by *Mayor of City of Philadelphia v. Educational Equality League*, 415 U.S. 605, 621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974) wherein failure to refer to the relevant labor pool was deemed to render the statistics presented "meaningless".

On the other hand in regard to the Appeals Court's action entering judgment for the plaintiff the Supreme Court reversed saying:

"The Court of Appeals totally disregarded the possibility that this prima facie statistical proof in the record might at the trial court level be rebutted by statistics dealing with Hazelwood's hiring after it became subject to Title VII." *Hazelwood, supra* 97 S.Ct. at 2742.

The disposition of this issue suggests that where the discrepancy alleged is the inclusion of employment decisions which are irrelevant in time to the alleged acts, the comparison is sufficient to support a prima facie case and shift the burden to the defendant to show that its actions during the relevant period rebut the inference of discrimination raised by the plaintiff's broad summary. This is buttressed by the approach taken to the statistical evidence in *Teamsters*. This distinction separates those statistics which can have no probative force, even if unrebutted, from those which will serve to show a relevant existing disparity unless the disparity is justified by the defendant. A comparison of apples to oranges can never show such a relevant disparity so no explanation is required.

▮▮▮ Thus this Court places the burden on the plaintiff to demonstrate its statistics to show a relevant comparison. In order to meet this burden it must have a sample from Allison which is adequately large to allow the result of the sample to be meaningful. *Mayor of City of Philadelphia v. Educational Equality League*, 415 U.S. 605, 621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974). The plaintiffs further must show that they are comparing the sample at Allison to the relevant pool of labor for that sample. *Hazelwood, supra* 97 S.Ct. at 2743. Here the relevant labor pool is not the outside community, but rather those working at Allison who were available for the particular position. There is no allegation here that Allison discriminates in hiring, therefore, reference to the community as in *Hazelwood* is improper. Rather a comparison is necessary between the composition of a given position and the composition of employees available at Allison to fill that position. *Stewart v. General Motors*, 542 F.2d 445 (7th Cir. 1976). This factor renders the need to choose between the plain-

tiffs' census data and the defendant's Sixth Count Data unnecessary though reference may be made to both studies to indicate the general background to the initial job placement dispute.

Finally, the discrepancy shown in the comparison must not be *de minimus* since such discrepancies could result from the imprecision of the statistical technique. The Supreme Court has recognized this problem and sanctioned the use of the standard deviation of the sample to control for this problem. *Casteneda v. Partida*, 430 U.S. 482, n. 17 97 S.Ct. 1272 n. 17, 51 L.Ed.2d 498 (1976). The chance the discrepancy is inherent is very slight where the sample figure is adjusted by three standard deviations. *See* F. Mosteller, R. Rourke and G. Thomas, Probability with Statistical Applications, 290 (2nd Ed. 1970). The standard deviation is determined by the sample size thus compensating for the inaccuracy a smaller sample may create.

It is this three step approach which the Court will use in evaluating the sufficiency of the plaintiffs' statistical proof. If it is found sufficient the burden will shift to the defendant to explain the discrepancy shown. This may be done by providing data which more specifically reflects Allison's employment decisions during the relevant period.

This type of inquiry will also be made for those mathematical summaries introduced by the parties. This evidence, rather than relying upon statistical comparisons, simply accumulates employment decisions to provide a broad picture of the effect of those decisions. Like the statistical samples, this type of summary must be scrutinized to assure the underlying information is relevant to this action.

Having made the foregoing analysis and applied the law therein to the action now before it, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### Background

1. Allison's Indianapolis operations consist of seven plants involved in the manufacture of aircraft engines, transmissions of various sizes, diesel engines, and periphery equipment of locomotive engines. Its hourly force from 1964 through 1976 has fluctuated between 7,340 and 10,301 employees while the number of salaried employees during that period fluctuated between 4,332 and 5,381.

2. Allison's operations require a high level of technical skill in both its salaried and hourly work forces. Approximately 96 percent of its hourly work force is employed in skilled or semi-skilled jobs. 85 percent of its salaried work force is employed in non-clerical positions.

3. As a government contractor, Allison is required to prepare and maintain a written Affirmative Action Program to provide equal employment opportunities for minorities and females. It has had Affirmative Action Programs in effect for minorities from 1968 until the present, and for women from 1971 to the present. In recent years, Allison has maintained Affirmative Action Programs also for handicapped persons and the Viet Nam era veterans and disabled veterans. A significant aspect of Allison's Affirmative Action Programs, as far as this action is concerned, is the determination of the availability in the relevant labor market of minorities and females to fill the jobs in Allison's organization. Through negotiations with the Office of Federal Contract Compliance Programs of the Department of Labor and the Defense Logistics Agency of the Department of Defense, Allison has developed a detailed method of determining availability for each job group in its organization, which has been approved by these governmental agencies. There are approximately eighty salaried job groups and twenty hourly job groups.

4. Allison's affirmative actions to increase the participation of blacks and females in its work force have included extensive recruiting at predominantly black colleges and universities since 1966. During the seven years preceding the trial 50% of the people recruited from college interviews have been black, and about 22% have been

female. Allison has had cooperative education programs in some 27 universities, approximately half of which were predominately black. Allison also has recruited extensively in the local school systems, beginning in grade schools, to interest young people in the type of work done at Allison. These efforts have been concentrated in inner-city schools. Similarly, Allison has participated in job fairs and job opportunity days sponsored by various schools and organizations in its attempt to interest blacks and females in employment at Allison.

In addition, Allison's affirmative actions have included conducting pre-apprentice training programs to increase the number of minorities and females entering apprenticeship programs for the skilled trades. Since 1969 Allison's pre-foreman training courses have included a minimum of 20% minority participants, with the result that approximately 20% of appointments to foreman position since that time have gone to blacks. Two of the individual plaintiffs to this action have taken advantage of these programs to advance themselves at Allison.

5. The hourly employees are represented by the UAW and by Local 933. The terms and conditions of their employment are governed by the collective bargaining agreements between General Motors Corporation and the UAW with locally negotiated supplemental agreements.

6. Paragraphs 58 and 59 of the National Agreements require that job classifications be organized into Non-Interchangeable Occupational Groups ("NIO Groups"). The organization of NIO Groups at each GM facility is negotiated locally to take account of the production requirements of the particular facility. Throughout the period of time relevant to this lawsuit, there have been seven non-skilled-trades NIO Groups at Allison. Group 1 contained the assembly classifications. Group 2 contained the inspection classifications. Group 3 contained miscellaneous classifications. Group 4 contained welding classifications. Group 5 contained machinery classifications involving grinding operations. Group 6 contained machining classifications involving cutting operations. Group 7, also referred to as the Clearing Group, contained entry-level production and maintenance classifications. A single production department frequently encompassed jobs in more than one NIO Group. Thus, Clearing Group jobs were often found in the same departments with other production jobs in Groups 5 and 6. Each of the skilled trades constituted a separate NIO Group.

### U.A.W.

7. No evidence in the record indicates that the U.A.W. substantially controlled Local 933 in its dealings with Allison.

8. Paragraph 6(a) of the agreement between the U.A.W. and General Motors Corporation specifically affirms the rights of all employees regardless of race, color, religion, age, sex or national origin to be treated equally under that agreement and further specifies that any failure in such treatment is to be itself grounds for grievance.

### LOCAL 933

9. No evidence was offered in regard to the claim by Herman Test of discrimination by Local 933.

10. Glenn Howard and Johnny Castille were involved in the operations of the Union as members of the Fair Employment Practices Committee indicating a willingness of Local 933 to not only represent all members of the union but to bring minority members into its operations.

11. The record includes in the testimony of Glenn Howard and Johnny Castille, as well as that of other plaintiffs, conclusory allegations of discriminatory representation on the part of the union, but no hard evidence in the record shows a difference in treatment or representation of minority union members. The Court finds that though there may have been an attitude problem among individual union representatives, there was no showing that where the same facts existed for a white and a black employee that the white received better treatment.

12. On several occasions plaintiffs who filed grievances with Local 933 failed to receive the relief they sought, but there is no showing that white employees faired better on such grievances. The union's task in the grievance procedure is to provide an avenue of appeal, not to guarantee the desired result.

13. No evidence in the record shows any sex discrimination on the part of Local 933.

## ALLISON

### Individual Claims

[Paragraphs 14–63 Omitted]

### Class Claims

#### Job Assignment

64. The class allegation in regard to job assignment involves initial agreement by Allison after hire. Job assignment through promotion and transfer is encompassed in a separate class claim below.

65. Delores Dungey, a representative of the salaried employees in this class, filed a charge with the EEOC alleging racial discrimination on December 10, 1971, thus placing the opening date of the Court's inquiry here at February 13, 1971. This precedes the two year statute of limitations date of August 23, 1971, and will therefore be determinative.

66. Like any business organization of its size, Allison's practices and procedures for salaried personnel administration are quite complex. Moreover, those practices and procedures have evolved over time, as Allison has attempted to improve their effectiveness. Beginning in 1974, General Motors instituted the Human Resources Management System (the "HRM system") to provide a standardized, corporation-wide "systems approach" to salaried personnel administration. The HRM system has been implemented at Allison. However, the HRM system represented only a codification and refinement of various procedures and practices that had been developed at Allison and other GM facilities through the years. The basic nature of the salaried personnel administration system at Allison has not changed substantially during the period of time relevant to this lawsuit. The following findings relating to the policies and practices used by Allison will distinguish, where necessary, between the modifications instituted under the HRM system and Allison's earlier procedures.

67. Allison's salaried work force is divided into eight levels of responsibility. These are labelled, in order of increasing responsibility Levels 2 through 8 and the Unclassified Level. Within each level there are various job classifications, which are given distinctive job codes and titles. However, because of the great diversity of technical and other tasks performed throughout General Motors and within Allison, these job codes do not describe the duties or activities of any particular job. It is possible, for example, that the jobs of two engineers with the same job classification will be entirely different in the technical aspects of their duties and in the qualifications necessary to carry out those duties.

68. Whenever an opening occurred in Allison's salaried work force, the supervisor responsible for that position was required to send a requisition to the Personnel Department. While the form of the requisition has changed over the years, the same basic information has been set forth in the requisition. First, the supervisor described the specific elements involved in the particular job to be filled. As noted above, Allison did not have particularized descriptions of the myriad of technical and non-technical jobs in its work force. The requisition provided the detailed description of the particular job opening. The immediate supervisor was responsible initially for preparation of the job elements, because he was in the best position to know the precise duties involved in the specific job. Second, the supervisor set forth the "candidate qualifications" that he believed a candidate for that job should possess. These candidate qualifications were based upon the key elements of the particular job. The qualifications could include a particular degree, but in virtually all such cases, a degree "or its equivalent" was specified.

69. After the requisition was filled out, it was sent to the Personnel Department. There, the key elements and candidate-qualifications listed by the supervisors were reviewed by members of the personnel staff. This was done by interviewers in the Personnel Department under the supervision of the Supervisor of Salaried Employment. The interviewers relied on their training and experience, on past requisitions for similar positions, and on observation of the work in the department issuing the requisition to determine the reasonableness of the key elements and the candidate qualifications. Since 1974, all requisitions were subjected to a second review by a personnel official to ensure that the job elements and candidate qualifications were reasonable as part of Allison's EEO control system. If, after review of the requisition, any Personnel Department official had questions about the key elements or candidate qualifications stated in a requisition, the questioned items were discussed with the supervisor who had prepared the requisition and with higher levels of management in the department involved. In many cases, the Personnel Department caused changes to be made in the specifications set forth in the requisition.

70. Consistent with an established "promote-from-within" policy, Allison first looked within its own organization to find a qualified employee to fill a job opening before it considered non-employee applicants. Thus, most requisitions, except for the lowest entry-level jobs, represented promotional or transfer opportunities, in the first instance, and hiring opportunities, only if qualified employees could not be found to fill the jobs.

71. When the Personnel Department received a requisition, it determined whether the job classification named in the requisition was in a job group which had been designated "under-utilized" with respect to minorities and/or females. "Under-utilization" was a determination made by Allison in the process of formulating its Affirmative Action Program each year. A job group was designated under-utilized, if the percent of minorities or women in the group was lower than their availability.

72. The next step was the determination of the scope of selection. The evidence revealed two important facts about the scope of selection for salaried promotions. First, no supervisor could unilaterally determine the scope of selection for any promotion. The scope of selection decision was jointly made by members of the Personnel Department and officials of the department in which the job opening occurred. Second, the scope of selection for a salaried promotion was flexible, and depended to a large extent upon the presence or absence of qualified women or minorities in the selection pool. In every case involving an under-utilized job group, and in most cases where the job was not under-utilized, the scope of selection was expanded until it included qualified minorities and women.

73. The initial scope of selection was ordinarily the department in which the job vacancy occurred. If that pool contained qualified minorities or females, it was the scope of selection. The members of the department were considered for the promotion, even if the supervisor did not recommend anyone in it. However, if there were no minorities or women in that pool, the scope of selection was expanded to include internal applications for promotions and Allison's promotability list. If this scope of selection still failed to include sufficient women or minorities, other sources within Allison were canvassed. Members of the Personnel Department searched personnel records for possible candidates for promotion, and supervisory personnel were contacted to determine if they knew of possible minority and female candidates. Since 1975, Allison has made a corporation-wide search for minority and female candidates for promotion to higher-level jobs. Where, despite these efforts, a qualified minority or female candidate was not found, Allison still might not make a promotion until it attempted to find black and female candidates from outside Allison's organization who could be hired into the open position. The decision whether to hire or promote in such a case would depend upon whether the job was under-utilized and the extent to

which Allison had attained its Affirmative Action goal. In short, the scope of selection, which could initially be quite narrow, was broadened until it contained black or female candidates or until a reasonable effort to do this proved unsuccessful. Since the inception of the HRM system, the scope of selection decisions have been monitored by members of the HRM Committee, which included personnel officials, members of management, and Allison's EEO Coordinator.

74. In some cases, a supervisor might have indicated on a requisition that he wished to promote a particular person within in his department to a job vacancy. Even in such cases, however, Allison's promotional system was designed to insure that minorities and females were given a fair opportunity to compete for the promotion. The supervisor was required to list all persons within the department who were considered for the promotion, and the supervisor was required to state the reasons each person considered was not selected for the promotion. The reasons given for rejecting a department member for promotion had to be concrete and related to the elements involved in the open job. This procedure was followed whether or not the job involved was under-utilized. By the same token, failure of a supervisor to recommend a black or female employee in his department did not preclude consideration of that individual for a particular promotion.

75. A promotion of the sort described above involved the transfer of an employee to a vacant job. There were also promotions, called "proficiency promotions", by which employees were reclassified to a higher job level while remaining in the same job. Proficiency promotions were given in recognition of the fact that, with experience, an employee's increased proficiency was anticipated—either the particular employee doing the job would be given the promotion or he would not—it would be impossible to identify a pool of candidates as was done for a promotion where there was a vacancy to be filled. Although initially recommended by the supervisor, proficiency promotions were reviewed to ensure participation of minority and female employees.

76. Since 1972, Allison has used an application system that allowed any salaried or hourly employee to apply for a particular salaried job classification. Before 1972, while there was no formal application procedure, employees could apply for salaried positions by contacting the Personnel Department and expressing a desire for advancement.

77. Annual performance appraisals have formed a part of the promotional process for salaried employees. The appraisal process under the HRM system was designed to eliminate unilateral judgments by particular supervisors, which might be biased or unfair, in favor of a procedure that allows the employee and his supervisors to work together to improve the employee's job performance. Each employee's appraisal involved the use of two forms. On one form, the employee was invited to list what he believed are the key elements of his job, what he has contributed in his job, where his problems lay, and his "action plan" for improving his performance. There was also space on the form for the employee to indicate any problems that have diminished his job performance, and to indicate short and long range career goals as well as fields of interest for future promotional consideration. On the second form two levels of management, the employee's immediate supervisor and the next level of supervision, collaborated to determine the key job elements in the employee's job and to evaluate the employee's performance with respect to each job element. Thus, at least two individuals were required to make these judgments to ensure a fair and unbiased appraisal. After the forms were completed, the employee and the supervisors met to discuss the appraisal of the employee's performance. In addition, the participants reconciled any differences in the key job elements entered on the two forms and discussed the "action plan" for improving job performance. They could discuss any other aspect of the employee's job that the employee wished to raise. Finally, on the ap-

praisal form the employee was invited to make any comment he wished about his appraisal. The form. was then signed by the employee. Every completed appraisal form was reviewed by the Personnel Department to make sure that the appraisal had been properly carried out. The Personnel Department became involved in the appraisal process itself, if the employee was rated as being seriously deficient in job performance. After the appraisal was completed, both the employee's performance appraisal and the employee's indication of interest in higher-level fields of interest was entered into General Motors' computerized personnel inventory. An employee could challenge any part of his appraisal through Allison's "open door" policy, which involved meetings between an aggrieved salaried employee and successive levels of management.

78. A very similar appraisal procedure was used by Allison from 1957 up to the implementation of the HRM system. Appraisals were carried out by supervisors in accordance with detailed written instructions. These instructions stressed that appraisals must be objective, unbiased, and based upon job performance. Appraisals were discussed with the employee, and every appraisal was reviewed by higher levels of supervision and by the Personnel Department.

79. Each year, Allison also compiled a "promotability list". Each employee was categorized in this list as "immediately promotable," "promotable with additional training," "promotable soon," and "not immediately promotable". Women and minorities were identified on the promotability list. However, a supervisor could not rely upon a low promotability rating alone as a reason for not promoting a candidate. The evidence revealed that many minorities and females have been promoted who were not rated as immediately promotable.

80. When Allison's Personnel Department was unable to fill a salaried job opening for which it had a requisition by a promotion or transfer in accordance with the procedures discussed above, it then considered nonemployee applicants for employment. The evidence showed that jobs in the Eighth and Unclassified Levels were filled almost exclusively by promotion.

81. Salaried employment applications were filed by functional area and job level, and by race and sex. They were not filed with respect to specific jobs. The applications were placed in those categories by employment interviewers on the basis of information on each application and information gathered in a preliminary employment interview, if one had been held.

82. When a requisition was received by the salaried employment section to be filled by a new hire, it was assigned to an interviewer. The interviewer reviewed the job elements and candidate qualifications shown on the requisition to make certain that he or she understood the nature of the job to be filled. If there were any questions, the interviewer could contact the department that issued the requisition. The interviewer then examined all applications for the functional area and job level which corresponded to the job to be filled. In order to correct for any errors in judgment that might have occurred in categorizing the applications, Allison used a system of "bracketing" the job categories. Under the system, all applications for the job level above and the job level below for the same functional area were examined along with those applications in the level corresponding to the job opening. The best qualified applicants were invited to Allison for interviews by both the interviewer and by members of the management in the department involved. The final hiring decision was made by the interviewer in consultation with the department management. During the period of time relevant to this lawsuit, Allison employed both blacks and females as interviewers.

83. Because hiring is not an issue in this action, the plaintiffs must prove the initial placement of blacks in salaried positions resulted in qualified applicants being placed in lower paying positions than similarly qualified white applicants. No evidence on this point was offered.

84. In Exhibit 46, plaintiffs' witness Alan Fechter compared the percentage of blacks in various job classifications at Allison with the percentage of blacks available for such positions in the Indianapolis SMSA and the United States as a whole. These figures do not satisfy the second phase of the Court's test of statistical evidence since they do not compare the placement of new hires to the relevant labor pool, i. e., those actually hired. Further the census data, even if a relevant source of comparison, is categorized for comparison to categories at Allison but the census categories include tasks extraneous to those performed at Allison. For example, "Professional, technical and kindred workers" includes "Religious workers," "social and recreation workers," "teachers, college and university," and "writers, artists and entertainers". These non-relevant categories may skew the figures and destroy their value as a relevant labor pool.

Even if the composition of the surrounding labor market were deemed to be the relevant labor pool the third phase of the Court's statistical approach is violated as well. No showing that the differences are not *de minimus* can be made from the critical values in this exhibit because they were calculated on the basis of the size of the census not the size of the sample number of employees at Allison, contrary to the formula in *Castenada* cited above. Utilizing the correct approach shows Allison has performed quite well in all but a few instances in initial job assignment in salaried positions.

Finally and perhaps most importantly the comparison here is not placements but rather the 1971 compositions of these job classifications. Such composition includes not only initial placements but transfers and promotions. Failure to separate these figures renders them useless in determining discrimination in initial job placements.

85. Exhibit 36, also prepared by Fechter, standing alone shows no comparison between Allison and a relevant labor pool. It suffers all of the failures of Exhibit 46 and in addition gives no figures for Allison relative to the categories there employed. The plaintiffs attempted to cure this latter point by posing three hypothetical questions to Fechter relative to the Allison labor force. Two of these questions were defective in that the figure given for percentage of blacks or females in the labor force was not that in evidence relative to Allison's labor force. In the one instance that the figure used was the same as that in evidence for Allison the calculation of the critical value is erroneously performed as discussed above and thus provides no useful comparison. Even if proper calculations are performed these figures again show the composition of a category of employees rather than the placement of new hires so that transfers and promotions are again mixed with new hires rendering the figures nonprobative.

86. Finally, plaintiffs offered exhibits 31A and 31B which show the disposition of job openings in under-utilized job classifications. Only instances where the jobs were not filled by protected persons were summarized in these exhibits thus no indication of relative discrimination can be shown in the absence of a showing of how many protected persons were similarly placed. Further only four such positions in both 1975 and 1976 as summarized in these exhibits were filled by a new hire, thus the sample is too small and thus violates the first phase of the Court's statistical approach.

87. As stated, no relevant evidence, including these exhibits, on initial job placement was offered; but Allison did offer evidence to show no discrimination has occurred. Exhibit H, like those discussed above offered by plaintiff, focuses upon hiring rather than initial placement in that it compares Allison to the surrounding labor market; however, the Court includes this evidence in its findings because of the valuable insight they provide to the overall picture of Allison's efforts to aid qualified women and minorities to find meaningful employment.

88. The availability statistics relied upon by Allison were compiled by General Motors and by Allison for use in the Affirmative

Action Programs ("AAP's") that Allison, as a government contractor, must submit to the federal government. The methodology used to calculate availability, and the implementation of that methodology has been extensively reviewed and approved by the federal government.

89. The geographical area used as the relevant labor market for Allison's calculations of availability depended upon the type of job involved. For entry-level and for jobs up to the 6th level, Allison used the higher of the Indianapolis SMSA or a "weighted county calculation" based upon an analysis of the counties from which Allison's employees commute. For jobs in the 7th Level and above, and for all jobs filled by recent college graduates, the relevant labor market was considered to be the nation as a whole. The Court finds that these are the relevant labor market areas. Even the plaintiffs' expert testified that the Indianapolis SMSA was the relevant labor market for lower level jobs such as foreman and clerical positions. In addition, the choice of relevant labor markets was the result of a long series of negotiations between General Motors and the federal government. The final choice of the relevant labor markets was approved by the federal government for use by Allison in the formulation of its AAP's.

90. To determine availability for those jobs whose relevant labor market was the Indianapolis SMSA, Allison used Sixth Count Census data. This Census data contains the most detailed occupational information available for various geographical areas.

91. The job of correlating the occupational titles in the Census and the jobs at Allison was performed by General Motors and Allison officials. First, General Motors obtained from the National Planning Data Corporation the Sixth Count Census data for the Indianapolis SMSA in the occupational titles which were similar to the jobs existing at Allison. Next, officials at Allison placed all of Allison's salaried job classifications into "job groups", each containing jobs having similar content, wage rate, and opportunities. The jobs were grouped by functional area and by level of responsibility. The job groups then were matched against the Census occupational titles, using a Census Bureau publication that described the content of the various occupational titles. The final correlation of job groups and occupational titles was made by a group of local Allison officials, who relied upon their experience and knowledge of Allison's jobs. However, the Allison officials also received from General Motors written and oral instructions in the proper way to relate Census occupational titles to General Motors' job groups. Local officials obtained additional assistance from General Motors when problems or questions arose in applying the Census data to Allison's plant population. Finally, both Allison's methodology and its performance in matching its job groups to the Census data was reviewed in detail and approved by the federal government for use in Allison's AAP's.

92. For jobs in the 7th Level and above, Allison used national availability figures. These availability statistics were agreed upon after negotiations with the federal government. Allison used data from national surveys in four major specialty areas to establish the availability of recent college graduates.

93. The plaintiffs have raised general arguments to impeach the accuracy and reliability of Allison's availability calculations. They have attacked the Census statistics on the grounds that they are 1970 data unadjusted for the passage of time, and that there was a systematic undercount of black persons in the 1970 Census. It appears, however, that there is no satisfactory way to update or adjust Census figures in the detail contained in the Sixth Count data. The plaintiffs have not shown the Court to what extent the availability figures would change if the defects they alleged were cured. Moreover, if Allison's calculations based on Census data are suspect, so must be the plaintiffs' availability statistics, for they are based upon the same Census data. On the totality of the evidence, the Court finds that, while the data used for Allison's

calculation of availability may not be entirely free from limitations, it represents the most accurate and detailed data available for the relevant labor markets applied in a careful and conscientious manner to Allison's work force. It is the best measure of actual availability in the relevant labor markets that has been presented to the Court. Accordingly, the Court finds that Allison's availability statistics are the benchmark against which to measure Allison's performance in the initial salaried job assignment of blacks and females in this case.

94. Defendant's exhibit H contains the initial job placement data set forth in the findings above. The exhibit also shows the availability of blacks and females in the relevant labor market for the job groups in which placements were made, with the exception of a few job groups for which no availability calculation had been made. The availability figures were taken from Allison's 1977 AAP, and represent the availability for particular job groups weighted by the proportion of placements into those groups.

95. Exhibit H demonstrates that since 1971 Allison has hired blacks and females into virtually all levels and all functional areas at a rate in excess of, and frequently well in excess of, their external availability. There are a few cases in which Allison's placements were below availability, but generally these were cases in which the availability percentage was low, and few placements were made. For example, between 1971 and 1973, no blacks were hired as 8th Level engineers, although they represented 3.8% of the available work force. Only two such placements were made, however, so that the expected number of black placements was only .078. By contrast, in the same time period 21 placements were made in the 7th Level engineering positions, where 5.1% of the relevant labor market is black—and 9.5% of the placements went to blacks. The same phenomenon can be seen with respect to female placements. Thus, while no women were placed in 7th Level positions in non-engineering and non-clerical jobs between 1971 and 1973, only 6 persons were placed in those jobs. Given female availability for these positions, 4.5%, the expected number of female placements was only .27.

96. The evidence considered as a whole rebuts any prima facie case of class-wide sex or race discrimination by Allison in salaried job assignment. Indeed, the evidence demonstrates that, consistent with Allison's obligations as a government contractor, Allison has added blacks and females to most areas and levels of its salaried work force in a proportion greater than their representation in the labor market.

97. Though the class in relation to initial job placement has been amended to include only black salaried employees, the Court desires to include in its findings evidence relative to the excluded employees in order to provide a broad picture of the employment of blacks and women at Allison to aid in its overall determination.

98. The plaintiffs rely heavily upon exhibit 46 to show sex discrimination in hourly job assignment. As noted above, this exhibit is defective in several ways and fails to provide prima facie proof of discrimination. It fails to focus on the placement issue itself, it fails to provide a relevant labor pool for comparison, and it fails to focus on the relevant labor pool, new hires.

99. The exhibits provided by plaintiffs in relation to initial job assignment of black employees suffer the same deficiencies noted above for Exhibit 46. In hourly employment the most significant problem is not in the statistical methodology but in the choice of the samples themselves. By looking at the sexual composition of a particular work area rather than the initial placements in that area over a given time period the plaintiffs mix promotion, transfer and seniority bumping decisions with initial placement decisions.

One example will show the serious problems with the plaintiffs' facts. In Exhibit 11–C, the plaintiffs set forth, for 1971, the black representation in entry-level jobs in the various NIO Groups. They argue that this proves discrimination in job assign-

ment. However, when the exhibit is viewed in the context of Allison's employment history, it is obvious that Exhibit 11–C says virtually nothing about Allison's job assignment practices. Between 1968 and 1971, the hourly work force at Allison was reduced by 28.7%. In the face of this reduction, it is clear that Allison made few initial job placements. Moreover, under the Local Seniority Agreements then in effect, workers reduced out of higher-rated classifications could bump down to lower rated classifications in their NIO Groups in the Clearing Groups. For those reasons, the racial composition of the entry level jobs contained in Exhibit 11–C was, in all likelihood, the result of the exercise of seniority rights during the hourly work force reduction. No inference can be drawn from this data concerning discrimination in job assignment.

100. The plaintiffs' statistical evidence was not strengthened by the testimony of the plaintiffs' witnesses. No witness for the plaintiff received an initial job assignment within the time period relevant to this class issue. Nonetheless, the individual testimony did indicate that blacks have been assigned to various NIO Groups. Glenn Howard was hired in 1968 as an Inspector, a job in NIO Group 2. Roosevelt Mason was hired in 1966 in the Gear Cutter (Spur, Helical, Spline) classification, which is in NIO Group 5. Clarence Jefferson was hired in 1966 as a radial drill operator. This classification is in NIO Group 6.

101. The court finds that no credible evidence of racial discrimination in initial job placement exists in the record. Even if this evidence were probative, that offered by Allison was more probative. The plaintiffs allege that Allison has followed a policy of assigning black employees to Clearing Group jobs. This claim is not supported by the evidence. In 1969, blacks received 11.8% of all initial hourly job assignments. All but one of the job assignments were made in NIO Groups 1 through 4. Between 1970 and 1972, during a period of significant reduction in Allison's work force, only two hourly placements were made. After 1973, blacks received initial placements in all NIO Groups at the following rates:

| NIO Groups | 1973 Total | % Blacks | 1974 Total | % Blacks |
|---|---|---|---|---|
| 1–4 | 128 | 56.3 | 212 | 27.8 |
| 5–6 | 616 | 29.4 | 531 | 28.2 |
| 7 | 378 | 47.4 | 383 | 34.7 |
| Total | 1122 | 38.5 | 1126 | 30.4 |

| NIO Groups | 1975 Total | % Blacks | 1976 Total | % Blacks |
|---|---|---|---|---|
| 1–4 | 44 | 36.4 | 132 | 28.0 |
| 5–6 | 378 | 25.9 | 383 | 25.3 |
| 7 | 99 | 43.4 | 150 | 27.3 |
| Total | 521 | 30.1 | 665 | 26.3 |

By contrast, according to Census data, blacks made up 12.4% of the Indianapolis SMSA. Thus, during this period blacks were placed in all NIO Groups at a rate higher than their representation in the general population.

### E.I.T. Selection

102. Beulah Wallace, a representative of the hourly employees who could seek entry into the Employees in Training Program, filed an EEOC charge alleging racial discrimination in the promotion of black employees on July 31, 1972, thus placing the opening date of the Court's inquiry here at October 5, 1971. Because this date is preceded by the two year statute of limitations date of August 23, 1971, the latter will control. No charge of sex discrimination in this regard was ever filed with the EEOC and is not actionable under § 1981.

103. The EIT program is a training program that enables hourly workers to achieve journeyman status in a skilled trades classification. The National Agreements provided that employees must apply for the EIT positions, and that EIT's:

" . . . shall be selected on the basis of their qualifications, . . . and when their qualifications are equal, employees with the longest seniority will be given preference."

104. From 1969 to 1973, black employees received 19.7 percent of the EIT placements. By comparison, during that time

black employees made up between 9% and 13.4% of the hourly work force. Between 1974 and 1976, when blacks were 13.9% to 14.9% of the hourly work force, they received 26.6% of the EIT placements.

105. In the early 1970's, all then-pending EIT applications were destroyed, and employees were invited to resubmit EIT applications. Therefore, comparison between EIT selections and EIT applications is possible only after that time. The following table shows the percent of total applications that were filed by blacks from 1972 to 1976, and the percent of all EIT placements made during that time that went to black workers. This comparison shows that black employees received EIT placements at a rate substantially in excess of their rate of application:

| Year | % of Total Applications Filed by Blacks | % of Cumulative EIT Placements Received by Blacks |
| --- | --- | --- |
| 1972 | 14.9 | 21.4 |
| 1973 | 11.6 | 27.7 |
| 1974 | 11.3 | 27.1 |
| 1975 | 11.8 | 27.0 |
| 1976 | 12.0 | 27.0 |

106. These overall figures preclude any finding that Allison has discriminated against blacks as a class in EIT selections.

107. The statistical evidence is not controverted by evidence of individual instances of discrimination. The plaintiffs failed to present credible evidence that any qualified black employee who had applied for an EIT position was passed over in favor of a white employee with less seniority. There is also no credible evidence in the record that Allison intentionally discriminated against black employees in EIT selection.

108. In order to provide a thorough review of employment at Allison, the Court includes here its finding relative to the sex discrimination claim which was dismissed due to lack of an EEOC charge. Few women have been chosen for EIT positions. However, this fact may be explained by factors other than discrimination. First, there were few women in the hourly work force during the relevant time period. Between 1969 and 1972, women made up less than 2% of the total hourly population. By the end of 1976, female representation had increased substantially but women still made up only 5.6% of the total hourly work force. For this reason, most women employed by Allison as hourly workers have relatively little seniority. Therefore, it is not surprising that few women would be selected, even if they had applied.

109. Moreover, the evidence indicates that few women have applied for EIT selection. No women applied in 1972 or 1973, and between 1974 and 1976, only 79 female applications were made. In 1976, applications by females made up 4.2% of the total number of applications on file. Between 1974 and 1976, a total of 94 EIT selections were made and two of these, or 2.1%, went to females. The selection of only two additional females would have put one selection percentage above the percentage of female applications. These numbers are far too small to permit the finding of a gross disparity in the treatment of female EIT applicants.

110. The plaintiffs failed to present credible evidence that any qualified woman who had applied for an EIT position was passed over in favor of a male worker with less seniority. There is no credible evidence in the record that Allison intentionally discriminated against female employees in EIT selection.

GROUP LEADER PROMOTIONS

111. Beulah Wallace, a representative of the hourly employees who claim to have been denied promotion to group leader, filed an EEOC charge alleging discrimination on account of her race and her sex in denial of promotion to group leader on February 17, 1972, thus placing the opening date of the Court's inquiry here at April 23, 1971. Because this date precedes the two year statute of limitations date of August 23, 1971, it will control.

112. Group Leader is an hourly rate position. Group Leaders assist the foreman in scheduling and assigning work, and in supervising the group they lead. Group Lead-

ers are paid at a rate $.10 per hour higher than the highest paid classification in their group.

113. The scope of selection for a Group Leader position is the group to be led. In some cases, this scope of selection includes an entire department. However, in other cases the group to be led, and hence the scope of selection for a Group Leader, is smaller than a department. One department could have several Group Leaders, each with a separate scope of selection within the department. Employees within the scope of selection are promoted to the Group Leader position pursuant to the provisions of paragraph 63(a) of the National Agreements. Under that paragraph, the employee with the greatest seniority is to be promoted unless there is another employee within the scope of selection who is "head and shoulders" above the more senior employee in ability to perform the job. As with all other promotions under paragraph 63(a) a worker who considered himself entitled to a particular Group Leader promotion could challenge Allison's application of the 63(a) standards through the grievance mechanism. Plaintiff Beulah Wallace testified that she received a Group Leader job as the result of filing a grievance.

114. Plaintiffs rely upon Exhibit 11–I to substantiate their race discrimination claim in promotion to Group Leader. That exhibit shows the composition of Group Leaders and the composition of the entire hourly labor force which is said to be the relevant labor pool for Group Leaders. Also shown are the figures for all classifications other than skilled trades. Significant disparities appear. The error in this exhibit is a failure to use a relevant labor pool. In each case the plaintiffs' "Source Group" was not in fact the pool from which particular Group Leaders were selected. The scope of selection for a Group Leader was the group to be led, which was no larger than a department and was occasionally smaller. However, the "Source Group" used by the plaintiffs is all persons in a particular classification throughout Allison's Indianapolis operation. Thus, in every case the "Source Group" is broader than the actual scope of

selection for any particular Group Leader position. It is impossible for the Court to determine from the exhibits to what extent black workers were available in the actual scopes of selection for Group Leader promotions. The comparison the plaintiffs seek to make between the Group Leader positions and the "Source Groups" is factually invalid, and fails to support any inference of discrimination in Group Leader selections.

115. Allison argues further that this exhibit fails to focus only upon promotion decisions within the relevant time period of this action by analyzing the composition of Group Leaders at a point in time rather than analyzing specific promotions within the time period relevant to this action. In this way, pre-action employment decisions may alter the result, however, the burden is on the defendant to explain composition figures at a point in time by coming forward with evidence indicating the propriety of decisions made during the relevant time period. Allison's failure here is not determinative, however, since the plaintiffs' evidence is defective in failing to provide a relevant labor pool for comparison.

116. Although plaintiffs' counsel alleged during trial that an examination of certain Allison computer printouts would reveal a small number of female Group Leaders, no exhibit or other evidence showing the result of such a count was presented to the Court in the course of the trial. All of the plaintiffs' exhibits on the Group Leader issue show only racial breakdowns. Having produced no evidence, the plaintiffs have necessarily failed to prove sex discrimination in Group Leader promotions. Even if presented, however, evidence that there have been few female Group Leaders at Allison would be insufficient to support a finding of discrimination within the relevant time period. Evidence as to the number of female Group Leaders means little in the absence of any proof that, when the actionable promotions were made, females were present in the scopes of selection for these promotions, and that females within the scopes had sufficient seniority to be considered for the Group Leader positions. Furthermore,

there was testimony that some Group Leader positions were physically demanding, so that some women might have been unable or unwilling to accept a Group Leader job even if one were offered. For all of these reasons, no finding of sex discrimination can be based upon the fact that there have been few female Group Leaders at Allison.

## HOURLY PROMOTION AND TRANSFER

117. Beulah Wallace, a representative of the hourly employees who have been denied promotions or transfers because of their race or sex, filed a charge with the EEOC on August 13, 1970, alleging she had been so treated thus placing the opening date of the Court's inquiry here at October 17, 1969. Because this date precedes the two year statute of limitations date of August 23, 1971, it will control.

118. Three contractual provisions govern the promotion and transfer of non-skilled-trades hourly employees at Allison:

(a) Paragraph 63(a) of the National Agreement;

(b) Paragraph 63(b) of the National Agreement; and

(c) The Local 63(b) Agreements.

119. In the 1964, 1967, 1970 and 1973 National Agreements, Paragraph 63(a) provided that:

"The transferring of employees is the sole responsibility of Management subject to the following:

(a) In the advancement of employees to higher paid jobs when ability, merit and capacity are equal, employees with the longest seniority will be given preference . . ."

120. The scope of selection for promotions under paragraph 63(a) is the product of local custom, practice and agreement between the UAW and the management at each General Motors facility. At Allison, each department has been the scope of selection for all classifications except Group Leader.

121. The promotion decision under paragraph 63(a) was generally made by the foreman who supervised the department in which the open job was located, along with the general foreman and, in some cases, the plant superintendent. In addition, members of the Labor Relations Staff at Allison assisted the line supervisors in the application of the contractual standard for selection. To implement the requirement of paragraph 63(a) that "when ability, merit and capacity are equal, the employee with the longest seniority will be given preference," Allison used a so-called "head and shoulders" test developed through arbitration. To fill a job opening under paragraph 63(a), the supervisor considered all of the workers within the scope of selection—the department. If one employee was "head and shoulders" above the more senior employees in terms of his qualifications for the particular job, that employee could be selected for promotion. Where no employee was head and shoulders above the others, the employees in the department were canvassed in order of seniority, and the promotion was awarded to the most senior employee who wanted the promotion and who was capable of doing the job.

122. If an employee believed that he was entitled, under paragraph 63(a), to a promotion given to another worker, the aggrieved employee could challenge the promotion through the grievance procedure. When a grievance was filed, Allison's application of the head and shoulders test was reviewed by division and union representatives and, if the grievance went to arbitration, by corporate and International Union representatives and by an impartial arbitrator. In fact, employees were aware of their grievance remedy, and large numbers of grievances were filed at Allison protesting paragraph 63(a) selections.

123. Prior to the 1976 National Agreement, there was no application procedure for paragraph 63(a) promotions. While an employee was free to inform his supervisor that he desired a particular position, such an indication of interest, whether oral or written, could not affect the operation of the principles contained in paragraph 63(a). However, if an employee had filed a valid

application under the provisions of the Local 63(b) Agreement, that employee would have had preference over anyone else who might have been in the scope of selection for a paragraph 63(a) promotion.

124. Paragraph 63(a) was substantially modified in the 1976 National Agreement. Paragraph 63(a)(1) of that agreement provides that an employee may make written application for promotion to higher rated classifications within his department. Paragraph 63(a)(2) allows an employee to make up to two written applications for higher rated classifications in other departments in his plant. When an opening occurs in a classification, the selection for promotion is made from those who have applied for the classification under paragraph 63(a)(1) and 63(a)(2), and "where ability, merit and capacity are equal, the applicant with the longest seniority will be given preference".

125. The method of selecting from among the applicants for a classification, including the operation of the head and shoulders test, is the same under the 1976 National Agreement as under the prior National Agreements.

126. Paragraph 63(b) of the National Agreement has remained unchanged from the 1964 National Agreement through the 1976 National Agreement. In relevant part, it provided:

"It is the policy of Management to cooperate in every practical way with employees who desire transfers to new positions or vacancies in their department. Accordingly, such employees who make application to their foreman or the Personnel Department stating their desires, qualifications and experience, will be given preference for openings in their department provided they are capable of doing the job. However, employees who have made application as provided for above and who are capable of doing the job available shall be given preference for the openings in their department over new hires. In case the opening is in an equal or lower rated classification and there is more than one applicant capable of doing the job, the applicant with the longest seniority will be given preference."

127. Paragraph 63(b) of the National Agreements also provided for the negotiation of Local 63(b) Agreements to cover situations where practical application of paragraph 63(b) was limited. Allison and Local 933 have had a Local 63(b) Agreement at least since 1956.

128. Allison's Local 63(b) Agreements have applied primarily to classifications in NIO Group 7, the Clearing Group. The agreements have allowed Clearing Group employees to apply for other jobs throughout the Allison Divison, including entry-level production jobs. The Local 63(b) Agreements have always allowed for promotion of employees in the Janitor, Janitress, and General Maintenance classifications as well as to certain other classifications. Between 1956 and 1973, the number of Clearing Group classifications from which employees could apply for promotion or transfer and the number of classifications to which they could apply were significantly enlarged. Since 1973, the Local 63(b) Agreement has permitted any Clearing Group employee to obtain a promotion or transfer to any other higher-rated classification in the Clearing Group. In addition, since 1970, the Local 63(b) Agreement has allowed employees in the highest rated Clearing Group jobs to apply for promotion to certain production classifications which are in NIO Groups 5 and 6.

129. Since 1964, the Local 63(b) Agreements have placed the following limitations on the right to be transferred or promoted under the agreements:

(a) All applications had to be on the proper form, and filled out in the employee's handwriting;

(b) The employee had to be capable of doing the job applied for;

(c) Applications more than one year old were automatically cancelled;

(d) If the employee was transferred to a job applied for or to any job classification paying a certain wage rate, all

applications under the Local 63(b) Agreement were automatically cancelled.

130. If an opening arises in a job classification for which there are applications on file under the Local 63(b) Agreement, the opening is filled by the eligible applicant under the Local Agreement. Thus a valid applicant under the Local 63(b) Agreement had a right to job openings in the classification applied for anywhere in Allison's Indianapolis operation, based upon his seniority and his ability to perform the job.

131. There is no evidence in the record that the hourly transfer and promotion provisions in the National Agreements or the Local Agreements were negotiated or maintained with the intention of discriminating against females. In fact, every Local Agreement from 1956 to 1973 contained a provision that:

"The names of male and female employees shall be listed jointly when they have the same classification in the same occupational group and shall receive the same treatment in the application of this seniority agreement".

Since 1967, paragraph 6a of the National Agreement has stated that:

"It is the policy of General Motors and the UAW that the provisions of this Agreement be applied to all employees covered by the Agreement without regard to . . . sex . . . ."

132. Likewise, there is no evidence in the record that the transfer and promotion provisions were negotiated or maintained with the intention of discriminating against black employees. Since 1964, paragraph 6a of the National Agreements has stated that:

"It is the policy of General Motors and the UAW that the provisions of this agreement be applied to all employees covered by this agreement without regard to race. . . . ."

133. The statistical evidence demonstrates that the operation of these transfer and promotion procedures has been consistent with the contractual nondiscrimination language. During the relevant time periods, there has been no significant adverse treatment of blacks or women in hourly promotions or transfers. Indeed, the figures frequently reveal the effects of Allison's affirmative action posture, which has sought to enhance the job opportunities of blacks and females.

134. Defendant's Exhibit BI is an analysis, based upon all records available to Allison, of the 2,065 hourly promotions and transfers made from 1972 to May of 1976. Exhibit BI shows that during that time black employees received 17.4% of the Paragraph 63(a) promotions, 28.8% of the Local Paragraph 63(b) Agreement promotions and 13.0% of the transfers under Paragraph 63(b) of the National Agreements. By comparison, in 1972 blacks made up 10.2% of the total non-skilled hourly work force; and in 1976, blacks were 14.6% of the total non-skilled hourly work force.

135. Defendant's Exhibit L shows the percentage of all promotions and transfers received by black employees. In Exhibit L, "promotion" is defined as a job change with an increase in pay, and "transfer" is defined as a change to an equal or lower rate classification, without regard to the contractual provision under which the promotion or transfer was made. The number of promotions and transfers received by blacks from 1969 to 1976 and their representation in the hourly work force was as follows:

| Year | % Promotions Received by Blacks | % Transfers Received by Blacks | % Blacks in hourly Workforce |
|------|------|------|------|
| 1969 | 13.2 | | 13.7 |
| 1970 | 11.6 | | 11.8 |
| 1971 | 8.5 | | 11.4 |
| 1972 | 16.2 | | 12.5 |
| 1973 | 17.5 | 23.4 | 16.0 |
| 1974 | 18.5 | 20.4 | 17.1 |
| 1975 | 18.3 | 22.0 | 16.6 |
| 1976 | 18.0 | 21.0 | 17.3 |

136. In every year after 1971, black employees at Allison received promotions and transfers under the seniority provisions at a rate in excess of their representation in the work force.

137. Females in Allison's hourly work force received the following percentage of transfers and promotions in the years 1969–1976:

| Year | % Promotions Received by Women | % Transfers Received by Women | % Women in Hourly Workforce |
|---|---|---|---|
| 1969 | 4.4 | | 1.9 |
| 1970 | 1.0 | | 1.7 |
| 1971 | .8 | | 1.5 |
| 1972 | .1 | | 1.6 |
| 1973 | 1.6 | 5.6 | 4.1 |
| 1974 | 5.4 | 10.1 | 6.1 |
| 1975 | 13.6 | 16.3 | 5.5 |
| 1976 | 9.2 | 13.4 | 7.0 |

These figures do not support a finding of class-wide sex discrimination. In three of the years shown, women were promoted at a rate well above their rate of representation in the work force. In four other years, the shortfall in female promotions was so small, and involved so few promotions, that no inference of discrimination is possible. For example, Allison made 520 promotions in 1971. At that time women made up 1.5% of the hourly work force. If women had been awarded promotions in proportion to their representation in the population, they would have received 7.8 promotions. In fact, women received four promotions. Likewise, in 1972, women received only ten fewer promotions than would have been expected from their percentage in the work force. In 1974, the shortfall was about six promotions. In only one year, 1973, was there a significant divergence between the percent of females in the work force and the percent awarded promotions. This fact must not be viewed in isolation. The data also shows that in other years, both before and after 1973, women received significantly more than their share of promotions, in terms of their representation in the work force and that in the remaining years the percentages were fairly equal. In this context, the inference is much stronger that the 1973 data were the result of factors of chance or the ebb and flow of the work force, than that the data were caused by systematic discrimination. On the whole, the Court finds that the statistical data fails to prove sex discrimination.

138. The plaintiffs have argued that certain of Allison's specific hourly employment policies and procedures are discriminatory. Strictly speaking these claims are irrelevant, in light of the proof that blacks and females have received at least their fair share of Allison's hourly promotions and transfers. Employment practices cannot be held discriminatory where there has been no disparate treatment of or impact upon blacks or women. Nonetheless, the Court has considered and reviewed the plaintiffs' allegations with respect to these specific employment practices.

139. The plaintiffs argue, first, that the transfer and promotion provisions prevented black and female workers from escaping NIO Group 7, the Clearing Group. The facts show that such was not the case. Entry-level production classifications in the Clearing Group were generally located in departments with higher rated production jobs in other NIO Groups. The Clearing Group workers were within the scope of selection for paragraph 63(a) promotions to all jobs in the department. The employees had the same right to higher-rated jobs as any other employees in the department. Moreover, under the Local 63(b) Agreements, persons in the Janitor and General Maintenance classifications had the right to promotion to entry-level production jobs, based on seniority and ability to do the job. Thereafter, these workers would be within the scope of selection for higher-level production jobs.

140. The evidence suggests that, far from being undesirable classifications, Clearing Group jobs are in some demand. As of December 12, 1977, there were 1,103 applications on file, under paragraph 63(b) of the National Agreement and the Local 63(b) Agreement, for various positions in the Clearing Group. There were a total of 182 applications for the General Maintenance, Janitor and Factory Sweeper, and Janitor, Power Conveyor classifications alone. On the other hand, as of November 1977, far fewer applications had been made to leave the Clearing Group. Only 354 such

applications were on file under paragraph 63(a) of the 1976 National Agreement and 46 such applications were on file under paragraph 63(b) of the National Agreement and the Local 63(b) Agreement.

141. The plaintiffs also claim that the seniority provisions described above discriminated against black and female workers, because job vacancies were not posted in advance, because employees in a department tended to know when an opening in the department would occur, and because employees could withdraw and re-file applications for transfer at will. The last aspect allegedly permitted employees to file applications for transfer to a job or jobs in which they anticipated an opening. The result of these facts, according to the plaintiffs, was an employee "grapevine" which gave whites and males, the majority of Allison's employees, an advantage in competing for job openings under the seniority provisions described above.

142. The evidence fails to support the plaintiffs' contentions in this regard. First, while one of the plaintiffs' witnesses made generalized conclusory allegations that a grapevine had existed at Allison, the plaintiffs failed to present concrete evidence tending to show that any sort of widespread grapevine operated at Allison with respect to job openings. Moreover, the plaintiffs failed to present any evidence that such a grapevine, even if it existed, worked to the detriment of black or female workers. The only evidence in the plaintiffs' case suggesting that informal advance notice of impending job openings had any relation to transfer or promotion indicated that black employees were recipients of informal notice. Charles Kinchelow testified that a white employee in a higher classification told him that the white employee was leaving his job and that Mr. Kinchelow should apply for it. Mr. Kinchelow, who is black, did apply and received the promotion.

143. In addition, the evidence demonstrated that the pre-application features of the promotional provisions negated the effect of any grapevine operating with regard to future promotions. If an employee were interested in a particular job classification for which he could apply under one of the contract provisions, he could file an application and then would be automatically considered for all job vacancies in that classification, whether he had knowledge of the vacancy or not. The plaintiffs argue that an employee with advance knowledge of a job vacancy who had not applied for that classification could make application for that job, thereby defeating the benefits of the pre-application procedure. Even if a worker were to make an application based on advance knowledge, he would get the job only if he were the most senior applicant, and the employee making the application would have no way of determining his seniority relative to that of other applicants. In any event, the plaintiffs presented no facts to support the argument that this system was discriminatory. No evidence was adduced to show that any white or male worker has ever made an application based on informal advance notice of a job vacancy, much less that any black or female worker has ever been prejudiced by such an application.

144. The plaintiffs claim that the failure of Allison to post job vacancies in advance prevented workers from monitoring the operation of the transfer and promotion system to ensure that the seniority provisions were adhered to. This claim is not supported by the facts. Prior to the effective date of the 1976 National Agreement, current seniority lists were posted in every Allison plant. These lists were updated every two weeks. The lists showed every non-skilled hourly employee, arranged by NIO Group, job classification, and seniority date. An employee interested in a particular job classification could monitor these seniority lists, and determine whether persons with less seniority had been promoted or transferred to that classification. If an employee believed that such transfers or promotions violated his contractual rights, he was able to challenge the transfers or promotions via the grievance procedure. Many employees reviewed the seniority lists, and the testimony of the plaintiffs' witnesses demonstrated that the lists were

effective in informing employees of personnel transactions. Beulah Wallace, a named plaintiff, testified that she examined the seniority lists "quite often", and that she filed grievances when she believed that a more junior employee had been promoted to the Group Leader position she desired. Roosevelt Mason, also a plaintiff, testified that he had desired a promotion to the aircraft final assembly classification, and that he was able to determine from the seniority lists that persons with less seniority than he had were placed into that classification. Mr. Mason filed grievances concerning these job placements. Likewise, plaintiff Willie Griffin testified that the seniority lists were used by employees to make sure that a less senior employee was not improperly promoted or transferred.

145. Paragraph 63 of the 1976 National Agreement requires lists of the job classifications and rates of pay in the department, as well as the text of paragraph 63 and of any local agreements negotiated pursuant to paragraph 63(b) to be openly displayed in each department. In addition, lists of all 63(a) promotions are displayed each week in each department. Thus, an employee who has applied under paragraph 63(a)(1) or 63(a)(2) for a classification in a particular department can easily determine whether a person with less seniority has been promoted to that classification.

146. The plaintiffs have attempted to prove that the seniority provisions embodied in the Local 63(b) Agreements have not been followed, in that employees have been promoted to jobs over more senior applicants. The plaintiffs presented an exhibit which purported to show 107 instances in which the most senior Local 63(b) applicant was passed over for a promotion, and 586 instances in which a more senior applicant was passed over. The evidence demonstrated, however, that these "seniority pass-overs" were not instances in which the seniority provisions were ignored. Rather, they could be explained within the confines of the Local 63(b) Agreements. The plaintiffs' exhibit was constructed on the assumption that in all cases a Local 63(b) application was viable for one year after the date it was received by Allison. The plaintiffs identified instances of "seniority pass-over" by comparing the seniority of the employee receiving a particular promotion with the seniority of all Local 63(b) applicants who applied within one year of the promotion. In fact, this assumption was erroneous. The file of Local 63(b) applications was a "moving file", it changed on a weekly basis. A Local 63(b) application could become inoperable for one of many reasons. If an employee withdrew an application; if an employee quit or was discharged; if an employee was or became incapable of performing the job; if an employee was offered a job in the classification applied for—in all of these cases, the employee's Local 63(b) application would be rendered invalid. However, Allison did not purge its files to remove these invalid applications. For that reason, the fact that the employee promoted is not the most senior of the applicants who filed within one year of the promotion does not necessarily mean that the seniority provisions have not been followed. Allison submitted evidence which purported to account for each of the 107 instances in the plaintiffs' exhibit where the most senior applicant was "passed over." The plaintiffs challenged the validity of Allison's exhibit, claiming that in 29 of the 107 instances, the explanation set forth in Exhibit BJ had been controlled for by the plaintiffs in constructing Exhibit 15–B. The plaintiffs did not dispute, however, the validity of Allison's explanation of the remaining 78 instances of alleged "seniority pass-over". Even if the plaintiffs' criticism of Exhibit BJ were correct, it would mean only that for some reason—and not necessarily because the seniority provisions were ignored—the most senior applicant was not chosen in 39 of the total of 316 Local 63(b) promotions made in 1973 and 1974. This evidence is insufficient to prove that, overall, the Local 63(b) Agreement has not operated as a seniority agreement. The plaintiffs' argument also ignores the facts, found above, that workers were able to learn of promotions and transfers that failed to observe seniority could be challenged in the

grievance procedure. On the whole, the plaintiffs' attempt to prove that the seniority provisions embodied in the Local 63(b) Agreements were not observed is un-persuasive. Therefore, the Court finds that the Local 63(b) Agreements constituted a bona fide seniority system.

### Salaried Promotions

147. Delores Dungey, a representative of the salaried employees who claim to have been denied promotions because of their race, filed a charge with the EEOC on December 9, 1971, alleging she had been so treated, thus placing the opening date of the Court's inquiry here at February 13, 1971. Because this date precedes the two-year statute limitations date of August 23, 1971, it will control.

148. The plaintiffs contend that Allison's system for evaluating and promoting its salaried employees relies upon subjective judgments of supervisors and personnel officials, and that this subjectivity allows for discrimination against black and female employees. Unquestionably, subjective factors enter into Allison's salaried promotional decisions. It is difficult to imagine how subjective judgments could be eliminated in the task of evaluating employee performance and selecting employees for promotion to particular jobs. The evidence established, however, that the promotion system described in the findings above, which has been used by Allison throughout the relevant time period, contained checks and balances to ensure that arbitrary, capricious, or ill-intentioned judgments of superiors could not operate to deny advancement to any employee. Indeed, to fulfill its affirmative action obligations, Allison's promotion system has long included an elaborate mechanism designed to give black and female employees every opportunity to be considered and selected for promotions.

149. Promotions from one job level to another represent the flow between two stocks—normally the job level below and the job level above. Necessarily, this flow represents only a small percentage of the total employment in the two levels involved; and the racial or sexual composition of this flow can be entirely different from that found in the job levels as a whole. Therefore, credible statistical proof relating to discrimination in promotions must focus on the persons receiving promotions. No inference of discrimination can be drawn from statistics that relate solely to the sexual or racial makeup of a job level as a whole.

150. When the flow data is examined, it is plain that Allison's promotion system has functioned in the manner intended. Both blacks and females have received equal or more favorable treatment in the relevant promotional transactions.

151. The following table shows the percent of females promoted by Allison from 1971 to 1976, and the percent of women in the salaried work force during those years:

| Year | Percent of Total Promotions Received by Women | Percent of Women in Salaried Work Force |
|---|---|---|
| 1971 | 9.1 | 12.1 |
| 1972 | 18.4 | 11.9 |
| 1973 | 21.2 | 12.2 |
| 1974 | 25.8 | 12.8 |
| 1975 | 23.5 | 13.4 |
| 1976 | 24.1 | 14.0 |

The percent of female promotions from 1972 through 1976 can also be calculated from the data in plaintiffs' Exhibits 24–A, 25–A, 26–A, 27–A, and 28–A. The figures derived from these exhibits are slightly different than the figures in Exhibit M. However, even if the plaintiffs' figures are accepted, the conclusion is the same: in every year from 1972 through 1976, the percent of female promotions was in excess, and generally well in excess, of the percent of females in Allison's salaried work force. Moreover, women received promotions at a rate in excess of their representation in almost every functional area in Allison's salaried work force. In total, from 1971 through 1976, women received 2.1% of all salaried promotions.

152. Blacks in Allison's salaried work force have received the following percentage of promotions, compared to their representation in the work force:

| Year | Percent of Promotions Received by Blacks | Percent of Blacks in Salaried Work Force |
|------|------------------------------------------|------------------------------------------|
| 1971 | 6.8 | 1.3 |
| 1972 | 6.0 | 1.4 |
| 1973 | 10.8 | 3.1 |
| 1974 | 21.9 | 5.8 |
| 1975 | 17.5 | 8.1 |
| 1976 | 14.9 | 8.5 |

As with the evidence relating to women, the number of promotions going to blacks, when computed from the plaintiffs' data, differs slightly from the figures above. However, even the plaintiffs' data show that in every year black employees received far more than their share of promotions. This phenomenon is found in every one of Allison's functional areas. From 1971 through 1976, blacks received 14.1% of all promotions.

153. Whether the Court credits the plaintiffs' figures or Allison's figures, the conclusion is the same: The Court must find that Allison has not discriminated against blacks or females in salaried promotions.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this action as outlined below pursuant to 42 U.S.C. § 2000e–5(f) (Title VII) and 42 U.S.C. § 1981.

2. In determining the opening date for the inquiry relative to the plaintiffs' claims under § 1981, this Court must look to the most appropriate Indiana statute of limitations. The two-year statute applicable to claims for injury to persons or property is the period best suited to this type of action. The plaintiffs' claims under that statute are therefore limited to actions by the defendants after August 23, 1971.

3. The time limitation relative to the plaintiffs' claims under Title VII is a date 300 days prior to the date a charge of discrimination was filed with the EEOC. The date of each charge is undisputed except for two letters sent by Beulah Wallace in the mid-60's. The Court holds that merely sending a copy of a complaint filed with the Indiana Civil Rights Commission to the EEOC does not satisfy the requirement of filing a charge with that body. The letter sent directly to the EEOC prior to lodging a complaint with the Indiana Civil Rights Commission does constitute an adequate charge even though it was not renewed after the state commission was notified and failed to act. This latter charge does not satisfy the prerequisites for this Court's jurisdiction, however, since no right to sue letter was ever requested or issued for that charge.

4. Jurisdiction of this Court over the International UAW is limited to 42 U.S.C. § 1981 since no EEOC charge was filed against this defendant. The individual plaintiffs who asserted claims against this defendant failed to show it substantially controlled the local or in any other way discriminated against them. The International UAW is therefore entitled to judgment in its favor as to each individual claim.

5. The individual plaintiffs who asserted claims against UAW Local 933 failed to prove any disparity in treatment by that Local as between similarly situated white and black or male and female members or any other form of discrimination against them. Local 933 is therefore entitled to judgment in its favor as to each individual claim.

6. The individual plaintiffs who asserted claims against Allison failed to prove any disparity in treatment by Allison as between similarly situated white and black or male and female employees or any other form of discrimination against them. Allison is therefore entitled to judgment in its favor as to each individual claim.

7. This Court's jurisdiction over the class claims of sex discrimination is limited by § 1981's inapplicability to sex discrimination claims and the prerequisite of a like or reasonably related EEOC charge by a class member for claims under Title VII. This Court may review its class certification order any time before a decision on the merits. No named plaintiff has filed an EEOC charge like or reasonably related to the following class claims:

(1) Discrimination against female employees in assignment to salaried jobs;

(2) Discrimination against black and female employees in assignment to hourly jobs;

(3) Discrimination against female employees in selection to the Employees in Training Program; and

(4) Discrimination against female salaried employees in promotions.

This Court therefore lacks Title VII jurisdiction over these claims and further lacks § 1981 jurisdiction as to those claims of discrimination against females. In category (2), this Court's jurisdiction also fails as to § 1981 for the black employees because no named plaintiff is able to assert discrimination in initial hourly job placement within the two-year statute of limitations which is here applicable. Allison is therefore entitled to a judgment dismissing these class claims.

8. In placing a time limitation upon the class claims which remain, the earliest charge filed with the EEOC which is like or reasonably related sets the date upon which the 300 day limitation period in Title VII is calculated. Only class members who could have filed a charge during that time period may recover. Of course the two-year statute of limitations also applies here and may control if it provides an earlier date. The opening dates of inquiry for each remaining claim are as follows:

(1) The claim of race discrimination in initial assignment to salaried jobs—February 12, 1971;

(2) The claim of race discrimination in selection for the Employees in Training Program—August 23, 1971;

(3) The claim of race and sex discrimination in promotion to Group Leader—April 23, 1971;

(4) The claim of race and sex discrimination in hourly promotions and transfers through the operation of the seniority system—October 17, 1969; and

(5) The claim of race discrimination in salaried promotions—February 12, 1971.

9. With respect to each class claim the Court holds the plaintiffs have failed to sustain their burden of proof of disparate treatment or disparate impact and even if such prima facie case were found Allison's evidence which focused on the actual act of discrimination alleged is more probative and overwhelmingly conclusive that no discrimination has occurred during the time periods relevant to this action. Allison is therefore entitled to judgment in its favor as to each class claim.

10. The plaintiffs failed to show that the seniority system which has been used at Allison continuously since a time well preceding the enactment of Title VII was in any way pretextual or intended to discriminate against black or female employees.

Dated this 1st day of September, 1978.

/s/ James E. Noland,

U. S. District Judge